# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
Records and information associated with the cellular device assigned call number numbers(414) 439-8361 ("TARGET TELEPHONE 1"), 414-639-1158 ("TARGET TELEPHONE 2"), and 414-732-3682 ("TARGET TELEPHONE 3") (collectively refer as the "Target Cell Phones"), that is in the custody or control of TMobile, as further described in Attachment A.

Case No. 26-898M(NJ)
Matter No. 2024R438

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the ____________ District of ____________
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before 5/4/2026 *(not to exceed 14 days)*

❒ in the daytime 6:00 a.m. to 10:00 p.m. ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to Hon. Nancy Joseph .
*(United States Magistrate Judge)*

☑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❒ for ____ days *(not to exceed 30)* ☑ until, the facts justifying, the later specific date of 04/29/2026 .

Date and time issued: 4/20/2026 @ 9:08 a.m

Nancy Joseph
*Judge's signature*

City and state: Milwaukee, Wisconsin

Honorable Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

**Return**

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: ______________________

______________________________
*Executing officer's signature*

______________________________
*Printed name and title*

**ATTACHMENT A**
**Property to Be Searched**
**MATTER NUMBER 2024R438**

1. Records and information associated with the cellular device assigned call number:

   **a.** **(414) 439-8361** (“**TARGET TELEPHONE 1**”), used by Jeanette LOPEZ, and with listed subscriber LizMary Martinez and listed address of 196 Calle La Loma, Mayaguez, Puerto Rico;

   **b.** **414-639-1158** (“**TARGET TELEPHONE 2**”), used by Jeanette LOPEZ, and with listed subscriber Samual P. STAIR, and listed address of 11512 W Woodside Drive, Hales Corners, Wisconsin, 53130, whose service provider is T-Mobile (“Service Provider”); and

   **c.** **414-732-3682** (“**TARGET TELEPHONE 3**”) used by Samuel P. STAIR, and with listed subscriber Samual P. STAIR,[7] and listed address of 11512 West Woodside Drive, Hales Corners, Wisconsin

(herein collectively refer as the **“Target Cell Phones”**), whose service provider is T-Mobile (“Service Provider”) a wireless telephone service provider headquartered 4 Sylvan Way, Parsippany, New Jersey.

2. The **Target Cell Phones**.

[7] Case agents observed the different spelling of STAIR’s first name with the service provider. Case agents have confirmed the spelling with the service provider, and it is Samual STAIR. Based on the investigation into the DTO, case agents believe this may just be a scrivener’s error by the service provider.

**ATTACHMENT B**
**Particular Things to be Seized**
**MATTER NUMBER 2024R438**

## I. Information to be Disclosed by the Provider

To the extent that the information described in Attachment A is within the possession, custody, or control of the Service Providers, including any information that has been deleted but is still available to the Service Providers or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Service Providers is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

a. The following subscriber and historical information about the customers or subscribers associated with **Target Cell Phones** for the time period from April 10, 2026, to present:

   i. Names (including subscriber names, user names, and screen names);

   ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

   iii. Local and long distance telephone connection records;

   iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

   v. Length of service (including start date) and types of service utilized;

   vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

   vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address);

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records; and

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by **Target Cell Phones**, including:

(A) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

(B) information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received).

b. Information associated with each communication to and from **Target Cell Phones** for a period of 30 days from the date of this warrant, including:

i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii. Source and destination telephone numbers;

iii. Date, time, and duration of communication; and

iv. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the **Target Cell Phones** or will connect at the beginning and end of each communication.

The Court has also issued an order(s) pursuant to 18 U.S.C. § 3123, dated today's date, for such information associated with **Target Cell Phones**.

c. Information about the location of **Target Cell Phones** for a period of **30 days**, during all times of day and night. "Information about the location of **Target Cell Phones** includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Service Provider, the Service Provider is required to disclose the Location Information to the government. In addition, the Service Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the

Service Provider's services, including by initiating a signal to determine the location of **Target Cell Phones** on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

ii. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II. Information to be Seized by the Government

All information described above in Section I that constitutes evidence and instrumentalities of distribution and possession with intent to distribute controlled substances; conspiracy to distribute and possess with the intent to distribute controlled substances; maintain drug involved premises; use of a communication facility in furtherance of a drug trafficking offense, violations of Title 21, United States Code, Sections 841, 843(b), 846, and 856, have been committed by Jeanette LOPEZ, Samuel P. STAIR, Otis LOCKETT, J.M.L., Abraham M. LOPEZ, and other persons and other persons as yet unknown (hereinafter "TARGET SUBJECTS") since at least August 2024.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Service Provider in order to locate the things particularly described in this warrant.

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

Records and information associated with the cellular device assigned call number numbers(414) 439-8361 ("TARGET TELEPHONE 1"), 414-639-1158 ("TARGET TELEPHONE 2"), and 414-732-3682 ("TARGET TELEPHONE 3") (collectively refer as the "Target Cell Phones"), that is in the custody or control of TMobile, as further described in Attachment A.

Case No. 26-898M(NJ)

Matter No. 2024R438

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the ______________ District of ______________________, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. 841. 843, 846, and 856 | Conspiracy to distribute and possess with the intent to distribute controlled substances; distribution and possession with intent to distribute controlled substances; maintaining a drug-involved premises; conspiracy to maintaining a drug-involved premises; and d. use of communication facilities to further and to facilitated. use of communication facilities to further and to facilitate drug trafficking offense |

The application is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

☑ Delayed notice of _____ days *(give exact ending date if more than 30 days:* 04/29/2026 *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

[signature]

*Applicant's signature*

Jeremy Dorn, SA HSI

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone *(specify reliable electronic means)*.

Date: 4/20/2026

*Judge's signature*

City and state: Milwaukee, Wisconsin

Honorable Nancy Joseph U.S. Magistrate Judge

*Printed name and title*

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**
**MATTER NUMBER 2024R438**

I, Jeremy Dorn, Special Agent, Special Agent with United States Department of Homeland Security Investigations (HSI), being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application of a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephones assigned call number:

   a. **(414) 439-8361** (“**TARGET TELEPHONE 1**”), used by Jeanette LOPEZ, and with listed subscriber LizMary Martinez and listed address of 196 Calle La Loma, Mayaguez, Puerto Rico

   b. **414-639-1158** (“**TARGET TELEPHONE 2**”), used by Jeanette LOPEZ, and with listed subscriber Samual P. STAIR, and listed address of 11512 W Woodside Drive, Hales Corners, Wisconsin, 53130, whose service provider is T-Mobile (“Service Provider”); and

   c. **414-732-3682** (“**TARGET TELEPHONE 3**”) used by Samuel P. STAIR, and with listed subscriber Samual P. STAIR,[1] and listed address of 11512 West Woodside Drive, Hales Corners, Wisconsin

[1] Case agents observed the different spelling of STAIR’s first name with the service provider. Case agents have confirmed the spelling with the service provider, and it is Samual STAIR. Based on the investigation into the DTO, case agents believe this may just be a scrivener’s error by the service provider.

(herein collectively refer as the **"Target Cell Phones"**), whose service provider is T-Mobile ("Service Provider") a wireless telephone service provider headquartered 4 Sylvan Way, Parsippany, New Jersey. **Target Cell Phones** are described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2. In this application, the United States seeks (1) historical cell-site location information; (2) historical precision location information; (3) prospective, real-time cell-site location information; (4) prospective, real-time precision location information (i.e., E-911 Phase II data and GPS); and (5) subscriber information and other historic non-content records and information.

3. Because this warrant application seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), I also make this affidavit in support of an application by the United States of America for an order pursuant to 18 U.S.C §§ 3122 and 3123, authorizing the installation and use of pen registers and trap and trace devices ("pen-trap devices") to record, decode, and/or capture dialing, routing, addressing, and signaling information associated with each communication to or from the **Target Cell Phones**.

4. I am a Special Agent of the United States Department of Homeland Security, Homeland Security Investigations/U.S. Immigration and Customs Enforcement (HSI/ICE), assigned to the Resident Agent in Charge (RAC) Milwaukee, Wisconsin. I am an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make

arrests for offenses enumerated in Section 2516 of Title 18, United States Code. I have been a federal law enforcement agent for over ten years.

5. I have received basic criminal investigative training, including thirty-six weeks at the Federal Law Enforcement Training Center (FLETC). In the course of my work, I have become knowledgeable with the enforcement of federal narcotics laws. I am currently a member of the Homeland Security Task Force as an investigator specializing in the smuggling, trafficking, and distribution of dangerous and controlled substances. I have participated in drug trafficking investigations conducted by HSI/ICE, the Drug Enforcement Administration (DEA), Federal Bureau of Investigation (FBI), the United States Postal Service (USPS) and other law enforcement agencies, which resulted in the arrest of subjects, and the seizure of property, assets, and controlled substances. As a narcotics investigator, I have participated in all aspects of drug investigations, including physical surveillance, execution of search warrants, undercover operations, court-ordered wiretaps, analysis of phone and financial records, and the arrests of numerous drug traffickers. I am familiar with various methods of smuggling and trafficking narcotics and other controlled substances and the proceeds from sale of such substances. I am also familiar with methods used to evade detection of both the controlled substances and the proceeds from their sale that are used by drug traffickers. I have participated in investigations involving Title 21 offenses and am familiar with the Interagency Cooperation Agreement between the DEA and HSI. I have also been the affiant of search warrants.

6. I investigate criminal violations of the Federal laws, including, but not limited to Title 18, United States Code, Sections 1956 and 1957 and Title 21, United States Code, Sections 841, 843, 846, 848, 952, and 963. I have been involved with various electronic

surveillance methods, the debriefing of defendants, informants, and witnesses, as well as others who have knowledge of the distribution, transportation, storage and importation of controlled substances. I have participated in the execution of multiple federal search warrants.

7. I have also received more general training and gained experience in interviewing techniques, search warrant applications, the execution of searches and seizures, and the seizure, processing, and identification of electronic devices.

8. I have received training in the area of narcotics investigations, money laundering, financial investigations, and various methods which drug dealers use in an effort to conceal and launder the proceeds of their illicit drug trafficking enterprises. I have participated in numerous investigations involving violations of state and federal narcotics laws. I have participated or assisted in numerous federal and state search warrants for narcotic related offenses that have resulted in the seizure of United States Currency, vehicles, real estate, and jewelry from individuals involved in narcotic trafficking.

9. I have authored and/or aided in investigations that have led to the issuance of numerous search warrants involving violations of both state and federal narcotic laws. These warrants involved the search of locations including: residences of targets, businesses their associates and relatives, “stash houses” (houses used as drug/money storage locations), storage facilities, bank safe deposit boxes, cellular/camera phones, and computers. Evidence searched for and recovered in these locations has included controlled substances, records pertaining to the expenditures and profits realized therefrom, monetary instruments, and various assets that were purchased with the proceeds of drug trafficking.

10. Through training, experience, and discussions with other experienced agents:

a. I have learned about how individuals and organizations distribute controlled substances

in Wisconsin as well as in other areas of the United States;

b. I am familiar with the appearance and street names of various drugs, including marijuana, heroin, cocaine and crack cocaine. I am familiar with the methods used by drug dealers to package and prepare controlled substances for sale. I know the street values of different quantities of the various controlled substances;
c. I am familiar with the coded language utilized over the telephone to discuss drug trafficking and know that the language is often limited, guarded, and coded. I also know the various code names used to describe controlled substances;
d. I know drug dealers often put telephones in the names of others (nominees) or obtain pre-paid cellular telephones from companies where no subscriber name or address is required to distance themselves from telephones that they use to facilitate drug distribution. Because drug traffickers go through many telephone numbers, they often do not pay final bills when they are done using a telephone number and then are unable to put another line in the name of that subscriber;
e. I know large-scale drug traffickers often purchase and/or title their assets in fictitious names, aliases, or the names of relatives, associates, or business entities to avoid detection of these assets by government agencies. I know that even though these assets are in names other than the drug traffickers, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them;
f. I know large-scale drug traffickers must maintain, on-hand, large amounts of U.S. currency to maintain and finance their ongoing drug business;
g. I know it is common for drug traffickers to maintain books, records, receipts, notes, ledgers, airline tickets, receipts relating to the purchase of financial instruments, and/or the transfer of funds and other papers relating to the transportation, ordering, sale, and distribution of controlled substances. That the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the traffickers have ready access to them;
h. I know it is common for large-scale drug traffickers to secrete contraband, proceeds of drug sales, and records of drug transactions in secure locations within their residences, their businesses, and/or other locations over which they maintain dominion and control, for ready access and to conceal these items from law enforcement authorities or rival drug traffickers. These secure locations include, but are not limited to safes, briefcases, purses, locked filing cabinets, and hidden storage areas in natural voids of a residence;
i. I know it is common for persons involved in large-scale drug trafficking to maintain evidence pertaining to their obtaining, secreting, transferring, concealing and/or expenditure of drug proceeds, such as currency, financial instruments, precious metals and gemstones, jewelry, books, records of real estate transactions, bank statements and records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys, and money wrappers. These items are maintained by the traffickers within residences (including attached and unattached garages), businesses or other locations over which they maintain dominion and control;
j. I know large-scale drug traffickers often use electronic equipment such as telephones (land-lines and cell phones), computers, telex machines, facsimile machines, currency counting machines, and telephone answering machines to generate, transfer, count, record and/or store the information described in the items above, as well as conduct

drug trafficking activities;

k. I know when drug traffickers amass large proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize the following methods, including, but not limited to: domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts, and otherwise legitimate businesses that generate large quantities of currency;
l. I know drug traffickers commonly maintain addresses or telephone numbers in books or papers that reflect names, addresses, and/or telephone numbers of their associates in the trafficking organization;
m. I know drug traffickers take or cause to be taken photographs of themselves, their associates, their property, and their drugs. These traffickers usually maintain these photographs in their possession; and
n. I know a "controlled buy" (and/or controlled contact) is a law enforcement operation in which an informant purchases drugs from a target. The operation is conducted using surveillance, usually audio and video taping equipment, and pre-recorded buy money. When an informant is used, he/she is searched for contraband, weapons, and money before the operation. The informant is also wired with a concealed body recorder and monitoring device. When the transaction is completed, the informant meets case agents at a pre-determined meet location and gives the purchased drugs and the recording/monitoring equipment to the case agents. The informant is again searched for contraband, weapons, and money. Additionally, all telephone calls made by the informant while under the direction and control of case agents are recorded.

11. In addition, during the course of such residential searches, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.

12. Further, I am aware through training and experience, as well as numerous conversations with both users of controlled substance and dealers of controlled substances, that drug traffickers may also establish stash houses. I am aware that stash houses are established as places where drug traffickers store large quantities of controlled substances, firearms, and cash.

Drug traffickers may establish a trap house and a separate location as a stash house, where drug traffickers do not engage in sales to drug customers at the location, but use the location primarily for storage. Similar to trap houses, stash houses also serve the purpose of concealing this illegal conduct from the view of law enforcement and make it difficult to attribute possession of any drugs, firearms, or cash found within the stash house to a particular individual during a search conducted by law enforcement. For example, stash houses allow the trafficker to store a large amount of controlled substances at a location separate from their residence. Stash houses are often not in the drug trafficker's name, have minimal furniture, minimal signs of typical residential activity, lack items inside connecting the location to the drug trafficker, and are generally a quiet location with limited activity, which avoids drawing complaints or concerns from neighbors or law enforcement.

13. Further, I am aware through training and experience, as well as numerous conversations with both users of controlled substance and dealers of controlled substances, that often drug houses, also called trap houses, are established as places where a variety of drug-motivated crime can occur at a single location. This includes serving as a place where (1) drugs are stored, processed/packaged, sold, and/or used; (2) commercial sex acts are performed in exchange for drugs or money to purchase drugs; (3) stolen goods are sold/traded for drugs or money to purchase drugs; and (4) drug proceeds are stored before they are able to be laundered by the organization. Further, trap houses, also serve the purpose of concealing this illegal conduct from the view of law enforcement. For example, open-air drug markets where drugs are bought and sold on a street corner allow law enforcement to observe hand-to-hand transactions and more easily identify illegal conduct. By contrast, trap houses allow the

trafficker to conduct drug sales behind closed doors and to control who is allowed access to the residence. These types of trap houses are commonly run by persons who are trusted to hold drugs and money and who are usually armed or given armed protection to perform this task. Oftentimes, these trap house operators as well as multiple drug users and others will be within the trap house so as to make it difficult to attribute possession of any drugs found within the trap house during a search conducted by law enforcement.

14. Further, based on training and experience, I am aware that it is a common practice within a drug trafficking organization (referred hereinafter as a ("DTO") to have various tasks assigned to persons involved in the organization. The members of the organization may have certain tasks, dependent on their hierarchy within the organization. It is common for those in charge of the organization to use those below them to make deliveries, transport, and hold/take possession of items, such as controlled substances for distribution or firearms for protection/intimidation. The persons higher in the DTO often avoid conducting the hand-to-hand transaction in order to insulate themselves, to avoid apprehension/detection from law enforcement.

15. I have participated in investigations that have led to the issuance of search warrants involving drug trafficking, firearms offenses, and human trafficking. These warrants involved the search of locations including residences and businesses of targets, their associates and relatives; "stash houses" (i.e., houses used as drug/money storage locations); storage facilities; cellular/camera phones; and computers. Evidence searched for and recovered in these locations has included controlled substances, records pertaining to the expenditures and profits realized from the distribution and sale of controlled substances, firearms, and/or human

trafficking, and monetary instruments and various assets that were purchased with the proceeds of the drug trafficking, firearms, and/or human trafficking.

16. Further, I am aware through training and experience, as well as numerous conversations with both users of controlled substance and dealers of controlled substances, that drug traffickers may also establish stash houses. I am aware that stash houses are established as places where drug traffickers store large quantities of controlled substances, firearms, and cash. Drug traffickers may establish a trap house and a separate location as a stash house, where drug traffickers do not engage in sales to drug customers at the location, but use the location primarily for storage. Similar to trap houses, stash houses also serve the purpose of concealing this illegal conduct from the view of law enforcement and make it difficult to attribute possession of any drugs, firearms, or cash found within the stash house to a particular individual during a search conducted by law enforcement. For example, stash houses allow the trafficker to store a large amount of controlled substances at a location separate from their residence. Stash houses are often not in the drug trafficker's name, have minimal furniture, minimal signs of typical residential activity, lack items inside connecting the location to the drug trafficker, and are generally a quiet location with limited activity, which avoids drawing complaints or concerns from neighbors or law enforcement.

17. I have participated in numerous investigations involving the seizure of computers, cellular phones, cameras, and other digital storage devices, and the subsequent analysis of electronic data stored within these devices. I have also participated in investigations involving the use of historical and prospective location information to identify targets, map patterns of travel, corroborate other evidence, and apprehend persons to be arrested. On numerous

occasions, this electronic evidence has provided proof of the crimes being investigated and corroborated information already known or suspected by law enforcement. During my investigations, I have regularly used electronic evidence relating to the commission of criminal offenses, including to prove intent, motive, and to identify co-conspirators.

18. I have conducted investigations ranging from death, drug, property, and human trafficking crimes by analyzing cell phone data including tower usage, call activity, and cellular activity while trying to pinpoint certain locations of suspects and/or victims. I know that when conducting drug and/or human trafficking investigations, cellular phone data is often a key piece of evidence based on my training and experience. Individuals who sell and use controlled substances and who engage in the trafficking of others often use cell phones to set up a transaction either through traditional means (phone calls or messaging) or by use of special applications downloaded on their phone. I know it is common practice for most people to rely heavily on the use of cellular telephones or electronic devices for many aspects of their daily lives. People commonly use cellular telephones or electronic devices to send and receive text messages, make voice calls, interact on social media, store contact information, store personal identifying data, maintain calendars or agendas, utilize maps or GPS functions, access the internet, and take photographs and videos. The same is true for those individuals who engage in drug trafficking and human trafficking.

19. I am familiar with the technologies of drug traffickers and those engaged in human trafficking. I know that drug traffickers and/or human traffickers often use electronic equipment and wireless and landline telephones to conduct drug trafficking and/or human trafficking operations. I know drug traffickers and/or human traffickers often use electronic

devices, such as cellular devices, to generate, transfer, count, record, or store the information described above and to conduct drug trafficking and engage in human trafficking. I am familiar with computers, cellular devices, and other electronic media or electronic storage devices and their uses by drug traffickers to communicate with suppliers, customers, co-conspirators, and with fellow traffickers and/or human trafficking victims, customers, co-conspirators, and fellow human traffickers. I know that drug traffickers and/or human traffickers often keep documents and records about drug transportation, drug sourcing, drug ordering, drug sale, drug distribution, victim information, victim posting, posting of advertising, communication with sex trafficking customers, human trafficking proceeds, etc. These documents, records, receipts, notes, and ledgers, regarding drug trafficking and/or human trafficking are often maintained where the traffickers have ready access. These records may be stored within computers, cellular devices, and other electronic media or electronic storage devices. These devices often contain evidence of illegal activities in the form of communication records, voicemail, email, text messages, video and audio clips, location information, business records, and transaction records. I know drug traffickers and/or human traffickers take, store, preserve, or maintain photographs or videos of themselves, their associates, their property, their drugs, their drug proceeds, their trafficking victims, and/or customers. These traffickers usually maintain these photographs or videos on computers, cellular devices, and other electronic media or electronic storage devices. I am familiar with and have experience in the use of devices used to commit those offenses as well as the available technology that can be used by law enforcement to assist in identifying the users of those devices and their locations.

20. I am currently participating in an investigation of the TARGET DTO and its

members and associates. I am familiar with the facts and circumstances regarding this investigation as a result of my personal participation in this investigation, and my review of: (a) consensually recorded telephone conversations and face-to-face meetings; (b) recorded jail calls which, prior to the parties' discussion, provided a warning that the calls would be recorded; (c) reports prepared by, and information obtained from, other federal, state, and local law enforcement agents and officers; (d) information obtained from witnesses, including confidential sources; (e) administratively subpoenaed and court ordered records; and (f) court authorized wire and electronic intercepts of telephone numbers **(414) 439-8361 (TARGET TELEPHONE 1)** and **414-639-1158 (TARGET TELEPHONE 2)**, used by LOPEZ and Jeremiah M. LOCKETT [2], DOB: 5/3/2009 **(**herein referred to J.M.L.) and 414-732-3682 (TARGET TELEPHONE 3), used by STAIR.

21. Information contained in this affidavit was either obtained directly by me or by other investigators who I believe to be truthful and credible. The facts in this affidavit come from personal observations, training and experience, and information obtained from other investigators and witnesses.

22. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that possible crimes of:

a. possession with intent to distribute and the distribution of controlled substances in violation of Title 21, United States Code, Section 841(a)(1);

[2] Given J.M.L.'s minor status, case agents have placed J.M.L.'s full name in this sole location and will refer to the target subject only by J.M.L. throughout the affidavit to limit future redactions.

b. maintaining a drug-involved premises in violation of Title 21, United States Code, Sections 856(a)(1) and 856(a)(2);
c. conspiracy to commit those offenses in violation of Title 21, United States Code, Section 846;
d. use of communication facilities to further and to facilitate the above listed offenses, in violation of Title 21, United States Code, Section 843(b); and

(hereinafter referred to collectively as the "TARGET OFFENSES")[3].

have been committed by Jeanette LOPEZ, Samuel P. STAIR, Otis LOCKETT, J.M.L., Abraham M. LOPEZ, and other persons as yet unknown (hereinafter "TARGET SUBJECTS/TARGET INTERCEPTEES"). There is also probable cause to search the information described in Attachment A for evidence of these crimes further described in Attachment B.

## JURISDICTION

21. The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

## Relevant Federal Court Orders

22. At various times between April 2025, and March 2026, United States Magistrate Judges for the Eastern District of Wisconsin have authorized the use of pen registers and trap and trace devices for DTO telephone lines including **TARGET TELEPHONE 1, TARGET TELEPHONE 2,** TARGET TELEPHONE 3, and telephones associated members of the DTO.

[3] Prior affidavit demonstrated probable cause that TARGET TELEPHONE 1, TARGET TELEPHONE 2, and TARGET TELEPHONE 3 are being used to commit all the TARGET OFFENSES enumerated in this paragraph, and Title 18, United States Code, Sections 924(c). However, for the purpose of this affidavit, case agents have not provided the additional probable cause as to the firearm-related offenses.

23. At various times between April 2025, and March 2026, United States Magistrate Judges for the Eastern District of Wisconsin have signed orders for prospective precision location data (pings) for DTO telephone lines including **TARGET TELEPHONE 1, TARGET TELEPHONE 2,** TARGET TELEPHONE 3, and telephones associated members of the DTO.

24. On December 19, 2025, the Honorable J.P. Stadtmueller, United States District Judge, Eastern District of Wisconsin, entered an order authorizing the initial interception of wire and electronic communications to and from (414) 439-8361 (TARGET TELEPHONE 1), used by LOPEZ and initial interception of wire communications to and from (414) 639-1158 (TARGET TELEPHONE 2), used by LOPEZ. On January 16, 2026, interceptions of TARGET TELEPHONE 1 and TARGET TELEPHONE 2 were extended and were voluntary ceased by case agents on February 13, 2026. Also on January 16, 2026, the Honorable J.P. Stadtmueller, United States District Judge, Eastern District of Wisconsin, entered an order authorizing the initial interception of wire and electronic communications to and from (414) 732-3682 TARGET TELEPHONE 3, used by STAIR, which were set to expire on February 14, 2026. On February 13, 2026 and March 13, 2026, interceptions of (414) 732-3682 TARGET TELEPHONE 3 were extended and expired on April 11, 2026.

25. Case agents have been investigating members of the Target DTO since at least May 2024.

26. At various times between April 2025, and March 2026, United States Magistrate Judges for the Eastern District of Wisconsin have signed orders for prospective precision location data (pings) for DTO telephone lines including TARGET TELEPHONE 1, TARGET TELEPHONE 2, TARGET TELEPHONE 3, and telephones associated members of the DTO.

27. On February 13, 2026 and March 16, 2026, Magistrate Judges William E. Duffin authorized the electronic surveillance of **Target Cell Phones,** which was served on the service provider and expired on April 14, 2026. Electronic evidence obtained from the authorized warrant has demonstrated LOPEZ's ongoing criminal conduct and assisted in identifying other co-conspirators and locations associated with the DTO.

**Interceptions over TARGET TELEPHONE 1 and TARGET TELEPHONE 2, show that TARGET TELEPHONE 1, TARGET TELEPHONE 2, TARGET TELEPHONE 3 and (414) 324-5384 are being used to commit the TARGET OFFENSES**

28. Wire and electronic interceptions over **(414) 439-8361** (**TARGET TELEPHONE 1**) and wire interceptions over **414-639-1158** (**TARGET TELEPHONE 2**) began on December 19, 2025, and extended on January 16, 2026. I believe that LOPEZ is the user of **TARGET TELEPHONE 1** and **TARGET TELEPHONE 2** during the below conversations because I have now listened to numerous intercepted calls over **TARGET TELEPHONE 1** and **TARGET TELEPHONE 2**, and LOPEZ's prior jail calls using **TARGET TELEPHONE 1** and **TARGET TELEPHONE 2**. From these calls, I am familiar with LOPEZ's voice. Further, at certain times during the wire intercepts, LOPEZ discusses matters, which are consistent with her personal life. For example, over numerous calls on December 21, 2025, LOPEZ, using **TARGET TELEPHONE 1** discussed needing to obtain a "package" that was scheduled to be delivered to S2 Real Estate. At approximately 1:06 p.m., electronic surveillance revealed LOPEZ arrived at S2 Real Estate, signed for, and received a package that had just been delivered by FedEx. Also, on January 9, 2026 LOPEZ using, **TARGET TELEPHONE 2**, discussed needing to go to 829 W. Greenfield Avenue to confront individuals who had reportedly broken into apartment 5. Soon thereafter, surveillance units

observed LOPEZ and J.M.L. at 829 W. Greenfield Avenue. In addition, location data for **TARGET TELEPHONE 2** revealed it was in the immediate vicinity of 829 W. Greenfield Avenue at this time as well.

29. Based on the court authorized intercepts, I believe that STAIR is the user of **414-732-3682 (TARGET TELEPHONE 3)** during the below conversations because I have now listened to numerous intercepted calls over **TARGET TELEPHONE 3**, and jails calls to **TARGET TELEPHONE 3**. From these calls, I am familiar with STAIR's voice. Further, at certain times during the wire intercepts and record jail calls, STAIR discusses matters, which are consistent with his personal life.

30. Further, based on the court authorized intercepts, I believe Otis LOCKETT is the user of (414) 324-5384 during the below conversations because I have now listened to numerous intercepted calls over **TARGET TELEPHONE 1** and **TARGET TELEPHONE 2**, and LOCKETT'S prior jail calls. From these calls, I am familiar with LOCKETT'S voice. Further, at certain times during the wire intercepts and record jail calls, LOCKETT discusses matters, which are consistent with his personal life.

## PROBABLE CAUSE

***Background***

31. Case agents have been investigating members of the Target DTO since at least May 2024.

32. Special Agents of HSI, case agents and local officers have received information concerning the illegal drug trafficking activities of members of the TARGET DTO from confidential human sources (CS#1 and CS#2):

a. CS #1 has given information concerning individuals involved in illegal activities, which has been independently verified through this investigation. The information has been verified through controlled buys, video recordings obtained during the controlled buys, queries through law enforcement databases, and surveillance. CS #1 began cooperating with law enforcement for consideration on pending criminal drug charges in Forest County beginning in approximately March 2025. CS #1 has had past arrests or convictions for felony drug offenses, felony family support offenses, felony and misdemeanor bodily harm offenses, resisting/obstruction, traffic offenses and noncriminal retail theft offenses. Further, during CS #1's cooperation, on May 30, 2025, CS #1 was re-arrested on drug offenses by State Patrol in Outagamie County, and his cooperation ended. This drug conduct was not at the direction of law enforcement and was contrary to CS #1's cooperation agreement. Within the context of the information detailed and relied upon for purposes of this application, I believe that CS #1 is credible and that CS #1's information is reliable notwithstanding CS #1's violation of CS #1's cooperation agreement.

b. CS #2 reported to the case agents with the FBI from approximately March of 2025 to the end of May 2025. In May 2025, CS #2 began cooperating with HSI. CS #2 was initially cooperating with FBI and other law enforcement officers in hopes of receiving third-party consideration for a family member on a felony criminal matter, until May 2025. No consideration has been provided to that family member. CS #2 is now cooperating in exchange for monetary consideration. To date, CS #2 has received one monetary payment of $10,000 for CS #2's cooperation with HSI. Certain information provided by CS #2 concerning this investigation has been

corroborated from external sources, including consensually recorded audio and visual recordings, and a review of information contained within law enforcement databases. CS #2 is a convicted felon and has a criminal history that includes prior misdemeanor convictions for traffic offenses, Bail Jumping, Disorderly Conduct, Possession of THC, Resisting an Officer, and Retail Theft. CS #2 has prior felony convictions for Robbery and Manufacture / Deliver Cocaine. I have discussed CS #2's cooperation with the law enforcement officer with whom CS #2 was working in exchange for third-party consideration. The officer indicated that CS #2 has provided reliable cooperation to that agency and believes that CS #2 is reliable. At no time during CS #2's cooperation with the HSI have I found CS #2 to have provided false information or engaged in untruthful or deceptive behavior. As further detailed below, during controlled operations, the basis of CS #2's information has been confirmed by case agents and determined to be truthful and reliable. Further, CS #2's information is based on CS #2's own personal observations and participation in surveilled controlled operations. Within the context of the information detailed and relied upon for purposes of this application, I believe that CS #2 is credible and that CS #2's information is reliable. CS #2 is currently cooperating with law enforcement.

***Court Authorized Intercepts and Investigation into DTO***

33. **Samuel P. STAIR, a.k.a. "Sam"** (hereinafter "STAIR"), DOB: March 11, 1974, is the owner of S2 Real Estate (2925 W. Lincoln Avenue, Milwaukee, Wisconsin), and at least 43 other limited liability corporations with similar names. STAIR operates as a landlord in the City of Milwaukee. He employs LOPEZ, and based upon their training, experience, and the

investigation to date, he is believed to provide rental properties to members of the DTO for the purpose of storing and distributing cocaine, fentanyl, and marijuana.

a. STAIR resides at 11512 West Woodside Drive, Hales Corners, Wisconsin. STAIR was arrested for Possession of THC and Possession of Amphetamine / LSD / Psilocybin by the Jefferson County Sheriff's Office on September 17, 1992. STAIR does not have any prior convictions.

b. Case agents believe STAIR is the user of telephone number **414-732-3682** (**TARGET TELEPHONE 3**) because of the following. First, is the subscriber on the account associated with that telephone number. Second, case agents have reviewed recorded jail calls between Wisconsin Prison system/ local jail inmates and the user of **TARGET TELEPHONE 3** in which the user of **TARGET TELEPHONE 3** offers substantial personal details that align with established information regarding STAIR. During these calls, the voice of STAIR was compared to a video recorded online interview of STAIR from Fox 6 Milwaukee, published on February 2, 2021, and determined to be the same person. Third, **TARGET TELEPHONE 3** is linked to a "WhatsApp" account with a photo of the face of STAIR. Fourth, federal court ordered precision location data for **TARGET TELEPHONE 3** consistently shows **TARGET TELEPHONE 3** utilizing a cell tower that covers STAIR's business at times when case agents know STAIR to be at that location based upon a review of pole camera footage. Fifth, CS #2 had recorded communications with STAIR on **TARGET TELEPHONE 3** on October 2, 2025, and October 3, 2025, January 5, 2026, and on January 19, 2026, on each of those dates, CS #2 recognized the voice on the phone as STAIR's voice. Case agents also confirmed it was STAIR's voice on these recordings because it matched STAIR's voice during the recorded interview with Fox 6 Milwaukee, American Slumlord Pilot[4], and body camera footage of STAIR. Sixth, case agents have reviewed communications from MCDADE's seized phone (414-439-7468) and observed communications with "Sam S2" via **TARGET TELEPHONE 3** between March 28, 2025, to October 7, 2025, consistent with STAIR using **TARGET TELEPHONE 3**, because the user of **TARGET TELEPHONE 3** is identified by MCDADE as "Sam" and MCDADE's phone texted with "Sam S2" concerning rent for the trap house address 1512 South 21st Street, Milwaukee, Wisconsin. Seventh, LOPEZ provided **TARGET TELEPHONE 3** as "Sam's number" to MCDADE on a recorded jail call on November 11, 2025. Eighth, an undercover agent has been communicating with STAIR via **TARGET TELEPHONE 3** in February and March 2026 regarding obtaining a rental for the purpose of drug trafficking and case agents have reviewed communications and recognize STAIR's voice as the

---

[4] "American Slumlord Pilot", https://www.youtube.com/watch?v=yd1f8MzdGs0&t=54s (viewed November 3, 2025). This approximately 28-minute video involves STAIR, LOPEZ, and other employees discussing STAIR's real estate / rental business, including the numerous properties STAIR rents and manages in Milwaukee, Wisconsin.

user of **TARGET TELEPHONE 3**. And finally, interceptions occurring over TARGET TELEPHONE 1, TARGET TELEPHONE 2, and **TARGET TELEPHONE 3** have revealed STAIR to be the user of **TARGET TELEPHONE 3**.

34. **Jeanette LOPEZ** (hereinafter "LOPEZ"), DOB: September 1, 1988, is an employee of Samuel STAIR, at S2 Real Estate (2925 W. Lincoln Avenue, Milwaukee, Wisconsin). Based on the investigation to date, LOPEZ's role in the TARGET DTO is to coordinate with drug traffickers for the purpose of renting STAIR's properties to the drug traffickers so the drug traffickers can use those properties as stash houses and trap houses. LOPEZ also interfaces with law enforcement when the drug houses she rents on behalf of STAIR and S2 Real Estate are targeted by law enforcement operations, including by warning the drug traffickers of impending law enforcement attention. I also believe LOPEZ is participating in the possession and distribution of controlled substances with other members of the DTO, including her child's father, LOCKETT, and son, J.M.L. I also believe that LOPEZ was in a romantic relationship with Russell MCDADE, whose involvement in the DTO is further detailed below. I believe that LOPEZ is involved in commission of the TARGET OFFENSES, in part, because:

a. LOPEZ has been intercepted on recorded jail calls discussing drug trafficking with MCDADE and has provided MCDADE advance warning of law enforcement operations at MCDADE's drug houses gained by virtue of her employment at S2 Real Estate, which owns the houses used by MCDADE to engage in drug trafficking.
b. CS #2 stated that while at the S2 Real Estate building at 2925 West Lincoln Avenue, Milwaukee, Wisconsin, CS #2 has been recruited to be a drug dealer by MCDADE and LOPEZ. During consensually recorded meetings and calls (including those over TARGET TELEPHONE 2) CS#2 has discussed with LOPEZ CS#2 renting properties from S2 Real Estate for the purpose of drug trafficking and LOPEZ has assisted in securing a stash house rental for CS#2.
c. LOPEZ has been on recorded jail calls with LOCKETT discussing obtaining and distributing controlled substances with J.M.L., as further described below.

d. LOPEZ's criminal history consists of a conviction for Resisting or Obstructing an Officer (Date of Conviction: 12-03-2009). LOPEZ has also been arrested for Harboring/Aiding a Felon, Battery, and Burglary of a Building or Dwelling.

e. LOPEZ is known to use (414) 439-8361 (TARGET TELEPHONE 1) based on the following: (1) public record Lexis Nexis Law Enforcement Data searches list (414) 439-8361 as associated with Jeanette LOPEZ (DOB September 1, 1988); (2) case agents located a law enforcement contact with Greendale Police Department (Case # 25-002646) in which LOPEZ was arrested for Disorderly Conduct on February 22, 2025. During that incident, LOPEZ provided telephone number (414) 439-8361 to the police as her contact number; (3) case agents have reviewed Milwaukee County Jail recorded calls and observed that telephone number (414) 439-8361 was in contact with LOCKETT, who is in custody for Fleeing / Eluding, 2nd Degree Recklessly Endangering Safety, and Possession of Cocaine.[5] Further, case agents reviewed Wisconsin Department of Transportation (WIDOT) records that revealed that LOPEZ and LOCKETT both share the same address of 333 North 36th Street, Milwaukee, Wisconsin. This has also been confirmed during surveillance of LOPEZ and LOCKETT. The current owner of 333 North 36th Street, Milwaukee, Wisconsin, is listed as STAIR in City of Milwaukee tax records with a listed address of 2925 W Lincoln Avenue. The content of the recorded jail calls and court authorized intercepts between LOCKETT and the user of TARGET TELEPHONE 1 make it clear that they share a personal/familial relationship and have a child in common; (4) CS #2 stated to case agents that LOPEZ is using telephone number (414) 439-8361; (5) case agents reviewed recorded jail calls between LOPEZ (using telephone number (414) 439-8361 and MCDADE since MCDADE has been in custody. Case agents are familiar with LOPEZ's voice from recordings made by CS#2 during in-person interactions with LOPEZ. I am able to identify LOPEZ's voice as the user of TARGET TELEPHONE 1 during the above-described recorded jail calls between TARGET TELEPHONE 1 and LOCKETT and TARGET TELEPHONE 1 and MCDADE; and (6) interceptions occurring over TARGET TELEPHONE 1 have revealed LOPEZ to be the user of TARGET TELEPHONE 1.

f. LOPEZ is known to use (414) 639-1158 (TARGET TELEPHONE 2) based on the following. First, as detailed further below, on December 1, 2025, LOPEZ told CS #2 to call her on TARGET TELEPHONE 2 to discuss renting properties for the purpose of drug trafficking. CS #2 subsequently called TARGET TELEPHONE 2, LOPEZ answered and indicated that she was "with her kids," implying that she had the phone with her at home. LOPEZ and CS #2 subsequently discussed renting homes for the purpose of drug trafficking on TARGET TELEPHONE 2. On December 2, 2025, as detailed below, CS #2 called TARGET TELEPHONE 2, LOPEZ answered the call, and they discussed the price of renting two locations for the purpose of engaging in drug trafficking. During the call, LOPEZ appeared to also discuss renting the locations and the price with STAIR. On December 5,

[5] Around January 21, 2026, LOCKETT was released from custody.

2025, as detailed below, CS #2 called TARGET TELEPHONE 2, LOPEZ answered and discussed not speaking on the phone or texting with CS #2 any longer. LOPEZ also discussed her diligence in covering her tracks with CS #2. The calls on December 1, 2, and 5, 2025, were recorded and reviewed by case agents. I can confirm LOPEZ's voice as the user of TARGET TELEPHONE 2 during these calls. Second, the listed subscriber for TARGET TELEPHONE 2 is STAIR, and I know that LOPEZ is employed by STAIR and S2. I believe that is consistent with LOPEZ using TARGET TELEPHONE 2 as part of her function as an S2/STAIR employee. Finally, interceptions occurring over TARGET TELEPHONE 2 have revealed LOPEZ to be the user of TARGET TELEPHONE 2.

35. **Otis LOCKETT III,** (hereinafter "LOCKETT"), DOB: May, 31, 1984, shares children with LOPEZ and is believed to be engaged in drug trafficking with LOPEZ, J.M.L., and other DTO members.

a. LOCKETT was in custody at the Milwaukee County House of Corrections and was released on January 21, 2026.
b. Case agents believe that LOCKETT is in a romantic relationship with LOPEZ and still engaged in drug trafficking while incarcerated, based upon multiple jail calls between LOCKETT and LOPEZ. Case agents have observed that LOCKETT will use his own Prison Inmate Pin (PIN) to contact TARGET TELEPHONE 1. However, case agents have also located additional recorded jail calls to TARGET TELEPHONE 1 made with other inmates' PINs. Based on my training and experience, I know that those engaged in illegal conduct while in custody, including drug trafficking, may use different inmates' PINs in an attempt to evade law enforcement detection. Based on case agents' review of the calls between LOCKETT's PIN and LOPEZ, case agents recognize LOPEZ's voice and LOCKETT's voice. Case agents similarly recognized LOPEZ and LOCKETT's voices in recorded jail calls between other inmates' PINs, and LOPEZ using TARGET TELEPHONE 1. Further, the content of the calls is consistent with LOCKETT's and LOPEZ's relationship, such as LOCKETT addressing himself as the father of LOPEZ's children.
c. Case agents have listened to recorded jail calls between LOCKETT and LOPEZ using TARGET TELEPHONE 1 that are consistent with LOCKETT and LOPEZ engaging in drug trafficking, including obtaining suspected controlled substances, directing J.M.L. to deliver controlled substances to other DTO members, and concerns over law enforcement contact. As detailed below, J.M.L. is LOPEZ's juvenile son.
d. Case agents believe LOCKETT is the user of telephone (414) 324-5384 because case agents intercepted court authorized intercepts from LOPEZ using TARGET TELEPHONE 1 to (414) 324-5384 and the detail shared between LOPEZ and the user of (414) 324-5384 are consistent with LOCKETT being the user. For

example, on January 21, 2026, LOCKETT used (414) 324-5384 to discuss obtaining his two phones from police custody, one being (414) 324-5384. Additionally, on January 12, 2025, there was a traffic stop made by the Milwaukee County Sheriff's Office (Activity # 25-001130 - Citation / 25-007072 – Otis LOCKETT is caller) wherein police contact was made with LOCKETT and the phone number was reported for LOCKETT was (414) 324-5384. Further, on January 21, 2026, at approximately 3:30 p.m., LOPEZ, using TARGET TELEPHONE 1, called LOCKETT at (414) 324-5384. LOCKETT said, "What's up babe?" LOPEZ replied, "Um, what the fuck is his name? Monty is calling me talking about he ain't got your number. Call him, he said he got that." LOCKETT acknowledged, "Alright." Based on previously-intercepted communications, case agents believe "Monty" is a close associate of LOCKETT and provides narcotics to LOPEZ and LOCKETT. Therefore, case agents believe LOPEZ instructed LOCKETT to call Monty because Monty had narcotics to supply LOCKETT ("Call him, he said he got that"). This is further consistent with the prior call between LOPEZ using TARGET TELEPHONE 1 and LOCKETT using (414) 324-5384, in which LOCKETT believes LOPEZ is asking if he picked up the control substances (LOPEZ asks, "You already went and picked it up?" and LOCKETT responses, "What? No ain't get…").

e. LOCKETT's criminal history consists of the following criminal convictions: Manufacture / Deliver Cocaine (<=5 grams) - Party to a Crime (Date of Conviction: 09-25-2002); Possession of THC (2nd + Offense) (Date of Conviction: 10-20-2004); Possession of Firearm by Felon (Date of Conviction: 05-02-2007); Burglary – Building or Dwelling (Date of Conviction: 11-23-2009); Attempt Theft (Date of Conviction: 02-08-2013); Possession of Firearm by a Felon and Possession of THC (2nd + Offense) (Date of Conviction: 04-30-2018); and Disorderly Conduct, Domestic Abuse and Resisting or Obstructing (Date of Conviction: 07-07-2025) which he is currently serving a sentence. LOCKETT has a criminal history that includes arrests for Probation Violation, Vehicle Operator Flee / Elude an Officer, 2nd Degree Recklessly Endangering Safety, Possession of Cocaine, Disorderly Conduct, Battery or Threat to a Judge, Resisting or Obstructing an Officer, Possession of a Firearm – Convicted Felon, Manufacture Deliver Cocaine, Retail Theft, Possession of Drug Paraphernalia, Possession THC, Trespass to Land or Dwelling, Theft Moveable Property, Endangering Safety Use of a Dangerous Weapon, Carrying a Concealed Weapon, and Possession with Intent – Cocaine.

***<u>LOPEZ use of TARGET TELEPHONE 1 and TARGET TELEPHONE 2 to commit target offenses:</u>***

36. Case agents believe that LOCKETT is in a romantic relationship with LOPEZ and engaged in drug trafficking, while LOCKETT was incarcerated and again now that LOCKETT is

released. This is based upon multiple jail calls between LOCKETT and LOPEZ and other court authorized intercepted calls. Case agents have observed that LOCKETT will use his own Prison Inmate Pin (PIN) to contact TARGET TELEPHONE 1. However, case agents have also located additional recorded jail calls to TARGET TELEPHONE 1 made with other inmates' PINs. Based on my training and experience, I know that those engaged in illegal conduct while in custody, including drug trafficking, may use different inmates' PINs in an attempt to evade law enforcement detection. Based on case agents' review of the calls between LOCKETT's PIN and LOPEZ, case agents recognize LOPEZ's voice and LOCKETT's voice. Case agents similarly recognized LOPEZ and LOCKETT's voices in recorded jail calls between other inmates' PINs, and LOPEZ using TARGET TELEPHONE 1. Further, the content of the calls is consistent with LOCKETT's and LOPEZ's relationship, such as LOCKETT addressing himself as the father of LOPEZ's children.

37. Case agents have listened to recorded jail calls between LOCKETT and LOPEZ using TARGET TELEPHONE 1 that are consistent with LOCKETT and LOPEZ engaging in drug trafficking, including obtaining suspected controlled substances, directing J.M.L. to deliver controlled substances to other DTO members, and concerns over law enforcement contact. As detailed below, J.M.L. is LOPEZ's juvenile son.

38. Case agents have also listened to intercepted calls since LOCKETT's release, consistent with him engaged in drug trafficking and renting a property from S2 Real Estate for drug trafficking.

39. On December 29, 2025, at approximately 9:00 p.m., LOPEZ, using **TARGET TELEPHONE 1**, received a call from LOCKETT at the Milwaukee Secure Detention Facility

using IC Solution's general jail number, (414) 533-1440. LOCKETT said, "Man I wonder Angie and them at, [U/I] in the alley." LOPEZ replied, "Uh, I don't know. I still be seeing them sitting outside though…I said, they still be sitting outside." LOCKETT asked, "Who, Angie and them?" LOPEZ answered, "Not Angie. Uh, I'm talking about Too Tall and them." LOCKETT said, "Okay. I'll figure it out. Man, I hope it won't be too much of a hassle trying to get all my people back, bro… Remember Kelly?" LOPEZ said, "Oh, yeah, the white lady." LOCKETT acknowledged, "Hell yeah. [U/I] like super sweating her ass." Later in the conversation, LOCKETT stated, "I might come work…I might come work for y'all for a little while too." LOPEZ reacted, "For real? Okay." LOCKETT continued, "Like I used to when I got myself, when I start grinding, I was working for you. I was needing action at work. You know what I'm saying? You was putting me in the right spots at the right time. I think I can do that [U/I] getting out of jail, about a week after I get out, work there for a couple of months."

40. Case agents believe Angie and Kelly were previous drug customers of LOCKETT's, and that LOCKETT said he hoped when he get released from incarceration he would be able to resume drug trafficking using some of his previous customers ("I hope it won't be too much of a hassle trying to get all my people back"). Case agents know from training and experience that "action" and "grinding" are terms used by drug traffickers to describe selling controlled substances to customers. Therefore, case agents believe that when LOCKETT gets released from incarceration, he plans to rent places from S2 Real Estate to drug trafficking. ("I might come work for y'all for a little while too" and "Like I used to when I got myself, when I start grinding, I was working for you). Case agents believe LOCKETT indicated that he previously worked for S2 Real Estate, and that S2 Real Estate allowed him to rent residences for

the purpose of selling narcotics ("I was needing action at work. You know what I'm saying? You was putting me in the right spots at the right time").

41. Also on January 9, 2026, case agents intercepted numerous wire communications from LOPEZ, at **TARGET TELEPHONE 1**, regarding the building at 829 South 19th Street, Milwaukee, Wisconsin, being broken into. Case agents have also identified 829 South 19th Street, Milwaukee, Wisconsin as LOCKETT's suspected trap house based on recorded jail calls and court authorized intercepts. Through the numerous communications with LOPEZ using **TARGET TELEPHONE 1,** case agents identified J.M.L., ABRAHAM, BOFFIL, and "Frog" (ROSS) as all being contacted to assist LOPEZ in getting the individuals who broke into 829 South 19th Street out of the building and securing the location. Based on the concerns for safety during these court authorized intercepts, case agents attempted to have local law enforcement intervene; however, the incident was over prior to officers arriving.

42. At approximately 7:07 P.M., LOPEZ, using **TARGET TELEPHONE 1**, called ABRAHAM using (414) 676-7540. During the call, LOPEZ tells ABRAHAM about the people who broke into 829 South 19th Street. LOPEZ expresses that she has been doing everything to keep the place secure. ABRAHAM states he can drive over there and asks if "Frog" (ROSS) is going as well. ABRAHAM expressed that he did not want LOPEZ to go there by herself. ABRAHAM states that he would smack the guys, and they would not come close with some pistols. ABRAHAM tells LOPEZ he believes that the "white guy" let them in and smokes dope. Both parties further discuss who to send to the location.

43. Based on my training and experience the investigation to date, case agents believe that 829 South 19th Street was used by LOCKETT as a trap house. Based on LOCKETT and

LOPEZ's conversations about LOCKETT resuming his drug trafficking activities and his statements about LOPEZ putting him in the right spots, as described above in Paragraph 30, case agents believe that LOPEZ is preparing 829 South 19th Street for LOCKETT's use for drug trafficking activities. Accordingly, case agents believe that LOPEZ's conversation with ABRAHAM, as described above related to keeping 829 South 19th Street secure pending LOCKETT's release. Further, case agents believe that to ensure that this location is available for LOCKETT to use for drug trafficking upon his release, LOPEZ knows that the squatters must be removed.

44. On January 9, 2026, case agents intercepted a call to LOPEZ on **TARGET TELEPHONE 2** from LOCKETT. During the call, J.M.L. gets on the line and LOCKETT and J.M.L. discuss firearms at the residence. LOCKETT says that he is upset about the guy playing with the thing. Based on prior court authorized intercept, I believe LOCKETT was referring to an individual named Jayden ("guy") playing with LOCKETT's firearms in the residence ("play with the thing"). J.M.L. says he understands. LOCKETT says that he doesn't want to have to get released and take that thing. Based on the content of the call, I believe LOCKETT was referring to a firearm ("thing"). J.M.L. says he told him [Jayden] that LOCKETT would take it if it is out or around. J.M.L. states that Jayden said that he doesn't leave the house without his gun. J.M.L. further warned Jayden to not let LOCKETT see him, which based on the context of the statement, I believe was referring to Jayden's firearm. LOCKETT affirms and says that if he hears him [Jayden] playing with it then he will call ask for it. J.M.L. states he [Jayden] is cocking the gun for no reason and taking the slide off every couple of seconds. Based on these statements, I again believe LOCKETT is referring to a firearm. LOCKETT says he [Jayden] is

going to break it and it won't work. Based on the prior statements made during the call, I believe "it" refers to a firearm. LOCKETT says that they don't have a reason to have one and he just wants to make sure nothing happens before he gets home. Based on Lockett's statement, I believe LOCKETT is referring to J.M.L. and/or Jayden not needing a firearm and that LOCKETT wants to make sure everyone is safe at the residence.

45. During this same call LOCKETT and J.M.L. discuss how J.M.L. needs to get back into contact with someone, because J.M.L. is "ready". Based on prior court authorized intercept between LOCKETT and J.M.L. on **TARGET TELEPHONE 1** and **TARGET TELPHONE 2**, I believe J.M.L. is stating he is ready to obtain additional controlled substances. J.M.L. asks LOCKETT to contact "him" because J.M.L. does not have his number. Based on my training, experience, and investigation into the DTO, I believe J.M.L. does not have the number for the drug source and is asking LOCKETT to contact the source. LOCKETT says that he has the guy's email and that they can Facetime. Based on my training and experience, I know that those engaged in criminal conduct will often use Facetime to discuss their criminal conduct, because criminal offenders often believe Facetime communication cannot be intercepted by law enforcement. Therefore, I believe, LOCKETT's and J.M.L.'s conversation is consistent with discussing contacting a drug source to obtain additional controlled substance to sell. LOCKETT also tells J.M.L. that he will be released on the 19th, which based on other court authorized interceptions, I believe refers to January 19, 2026. I further believe LOCKETT is referencing this date to let J.M.L. know that LOCKETT will take over the drug trafficking business once released.

46. On January 17, 2026, LOPEZ, using **TARGET TELEPHONE 1**, received a call

from LOCKETT at the Milwaukee Secure Detention Facility using IC Solution's general jail number, (414) 533-1440. During the call Lopez stated that she spoke with "Monty" and that he was supposed to come to the house but never did. LOPEZ was also supposed to $600 and LOCKETT replies that this is not bad. LOPEZ told LOCKETT that she will have J.M.L. call Monty when J.M.L. returns home.

47. Based on my training and experience, I believe Monty is a drug dealer due the nature of the conversation in this call. For example the price of $600 is consistent with a price for an ounce of cocaine. LOPEZ and LOCKETT also both refrain from speaking about what it is that they are purchasing for the $600 throughout the call, which is consistent with the manner one would speak on a recorded jail call concerning an illegal substance. In addition there were previous calls between LOPEZ and LOCKETT from days prior that referenced LOPEZ running out and not having the necessary drugs to sell to "B". "B" has been identified as Brandon KING during this investigation and is known to do short hand-to-hand transactions with LOPEZ at the rear entrance of her home. Previous jail calls also speak of "B" as being a past customer of LOCKETT that was still being served by LOPEZ during his absence in jail.

48. On January 21, 2026, case agents intercepted a call to LOPEZ on **TARGET TELEPHONE 1** from LOCKETT, using (414) 324-5384. During the call, LOCKETT tells Lopez he received his phones from police custody:

**LOCKETT:** [ASIDE: I'on know. Wassup, you good? You been good? Yeah, I’ m good. I’ m super (U/I) now. Yeah, I’ m finna– I’ m on the South Side. I’ **ll** call you when I (U/I). A'right, I got you. A’ right.] So, um.

**LOPEZ**: Yeah.

**LOCKETT**: Already crackin’ , what’ s happenin’ .

**LOPEZ:** You already went and picked it up?

**LOCKETT:** What? Nah, I ain't get–

[VOICES OVERLAP]

**LOPEZ:** Your phone.

**LOCKETT:** Yeah, I got my phone now. They had it in my property.

**LOPEZ:** Both of ‘ em?

**LOCKETT:** Yup.

**LOPEZ:** A’ right. Don’t make no sense.

**LOCKETT:** You said what?

**LOPEZ:** And all your– and the cards, too?

**LOCKETT:** Nah, just– this my phone, my other phone the police– at the police station. That was my new phone they had got.

**LOPEZ:** Oh, okay, okay. You gotta get that then?

**LOCKETT:** [ASIDE: I'on know. Wassup, you good? You been good? Yeah, I’ m m super (U/I) now. Yeah, I’ m finna– I’ m on the South Side. I’ ll c when I (U/I). A'right, I got you. A’ right.] So, um.

**LOPEZ:** Yeah.

**LOCKETT:** Already crackin' , what' s happenin' .

**LOPEZ:** You already went and picked it up?

**LOCKETT:** What? Nah, I ain't get–

[VOICES OVERLAP]

**LOPEZ:** Your phone.

**LOCKETT:** Yeah, I got my phone now. They had it in my property.

**LOPEZ:** Both of ' em?

**LOCKETT:** Yup.

**LOPEZ:** A' right. Don't make no sense.

**LOCKETT:** You said what?

**LOPEZ:** And all your– and the cards, too?

**LOCKETT:** Nah, just– this my phone, my other phone the police– at the police That was my new phone they had got.

**LOPEZ:** Oh, okay, okay. You gotta get that then?

49. Case agents recognized LOCKETT's voice using (414) 324-5384, based on review of prior record jail calls. Based on my training, experience, and investigation into the DTO, I believe LOCKETT retrieve his phone ((414) 324-5384) from police custody after being released (Yeah, I got my phone now. They had it in my property.). Further, based on review of the call, I believe LOCKETT previously possessed more than one cellphone (Lopez: "Both of ' em?"; Lockett: "Yup"). Based on my training and experience, I know that those engaged in drug trafficking will often use multiple cellphones, to attempt to evade law enforcement. Further,

based on my training and experience, I believe that LOCKETT is telling LOPEZ he is distributing controlled substances ("I'on know. Wassup, you good? You been good? Yeah, I' m good. I' m super (U/I) now. Yeah, I' m finna– I' m on the South Side. I' ll call you when I (U/I). A'right, I got you. A' right. So, um." and "Already crackin' , what' s happenin'") Based on my training, experience, and investigation into the DTO, I know that they will distribute controlled substances on the southside of Milwaukee. Further I know the term "crackin" is a slang word used by drug traffickers to refer to the distribution of controlled substances.

50. Also on January 21, 2026, case agents intercepted an outgoing call from TARGET TELEPHONE 1 to Lockett at (414) 324-5384 at approximately 10:53 AM. During the call, LOPEZ informs LOCKETT that "Monty" is looking for Lockett's number and to call "Monty".

| | |
|---|---|
| **LOCKETT:** | Hello. |
| **LOPEZ:** | Hey. |
| **LOCKETT:** | What's up babe? |
| **LOPEZ:** | Um, what the fuck is his name? Monty is calling me talking about your number. Call him, he said he got that. |
| **LOCKETT:** | Alright. |
| **LOPEZ:** | Alright. |

51. On January 21, 2026 at approximately 11:48 AM Montrel Lenard-Ivory was observed and video recorded entering the front of LOPEZ's residence of 333 N 36 St, Milwaukee, Wisconsin.

52. On January 21, 2026 at approximately 11:57 AM Montrel Lenard-Ivory is

observed leaving in a blue Honda Crosstour, bearing Wisconsin license plate BBR-4644. This vehicle is registered to Donna M. Ivory (F/U, 11-24-1951). A Lexus Nexus Law Enforcement public record search also shows this to be the mother of Montrel Lenard-Ivory of the same date of birth.

53. Based on the investigating in the DTO, case agents believe "Monty" may be a source of controlled substances for LOCKETT and LOPEZ. Based on my training, experience, and investigating into the DTO, I believe that during the call, LOPEZ is instructing LOCKETT to contact "Monty" due to Monty having controlled substances for LOCKETT ("Call him[Monty], he said he got that). I know that those engaged in drug trafficking will often not refer to the actual control substance over the phone due to concerns about others overhearing the conversation regarding illegal substances or the possibility of law enforcement detection. Instead drug trafficker may use vague identifiers like "that".

54. Case agents have also determined the LOCKETT is again renting a trap house from STAIR and LOPEZ based on the reviewed jail calls and court authorized intercepts. For example, on February 6, 2026, at approximately 11:55 a.m., LOPEZ, using T**ARGET TELEPHONE 1**, sent an electronic message to (262) 825-4151. This message contained a photograph of US currency (Figure 1) and a receipt (Figure 2), consistent with LOCKETT renting a S2 property for drug trafficking. On this receipt, handwritten was the following: *Date: 2/6/26; From: Otis Lockett; Nine hundred Fifty 00/100; For: 829 S. 19th #1; Signed by: Jeanette Lopez.*





(Figure 1) (Figure 2)

55. Case agents believe LOPEZ sent this photograph as confirmation that LOCKETT paid for one month's rent for 829 S. 19th Street #1, Milwaukee, Wisconsin, an S2 Real Estate owned property. Based on the investigation to date, as well as intercepted communications, case agents believe LOCKETT rented this property and utilized it for drug trafficking, prior to being incarcerated and plan to continue to use the location for the DTO's drug trafficking. Case agents believe this, based on record jail calls in which LOCKETT and LOPEZ discussed LOCKETT's plans to again rent this apartment and traffic narcotics from it.

**b. LOPEZ and STAIR Examples**

56. STAIR is the owner of S2 Real Estate (2925 W. Lincoln Avenue, Milwaukee, Wisconsin), and at least 43 other limited liability corporations with similar names. STAIR operates as a landlord in the City of Milwaukee. He employs LOPEZ, and based upon their training, experience, and the investigation to date, STAIR and LOPEZ are believed to provide rental properties to members of the DTO for the purpose of storing and distributing cocaine, fentanyl, and marijuana. It is further believe that STAIR obtain drug proceeds from DTO members and deposits the funds into bank accounts to appear as legit rental incomes.

***January 20, 2026, LOPEZ and TARGET TELEPHONE 3 electronic communication***

57. On January 20, 2026, between approximately 11:18 a.m. through

approximately 3:45 p.m. LOPEZ, using **TARGET TELEPHONE 1**, and STAIR, using **TARGET TELEPHONE 3**, exchanged a series of text messages. These messages are as follows:

> **LOPEZ**: What about the other house
> **STAIR**: What one?
> **STAIR**: If we want to stick them at 8:16 to do security there and one of the shittier units or if we want to put them on 5th Place to make sure the place stays hot and he's going to have to put electric and stuff in his name or a family member and he's going to have to put electric and stuff in his name or a family member
> **STAIR**: I mean otis old building to keep crack heads out
> **LOPEZ**: I offer him the units. He says he rather take 816.
> **STAIR**: He can go to 816 if he can pay for it
> **STAIR**: He's going to need to go to something for free for now or you can stay with his family until he's got enough money for down payment

58. Based on other intercepted calls, case agents believe LOPEZ and STAIR discussed renting an apartment to ESKRIDGE. STAIR advised they could allow ESKRIDGE rent an apartment at 816 W. Greenfield Avenue if ESKRIDGE wanted to work as "security" for S2 Real Estate ("If we want to stick them at 8:16 to do security there"). Case agents know from this investigation and intercepted calls that LOCKETT previously rented an apartment at 829 South 19th Street. Therefore, case agents believe STAIR then corrected himself and said that he meant ESKRIDGE could have an apartment at 829 South 19th Street ("I mean otis old building to keep crack heads out") if ESKRIDGE would be willing to act as "security" there. Based on my training, experience, and the investigation into the DTO, I know that STAIR refers to "security" when discussing a drug trafficker keeping STAIR's tenants and the drug traffickers' users paying rent and not bringing law enforcement attention or causing "drama" (as STAIR often refers to it) at the residence. LOPEZ said she offered ESKRIDGE either 816 W. Greenfield Avenue or 826 South 19th Street, and ESKRIDGE advised that he

would prefer to rent an apartment at 816 W. Greenfield Avenue ("I offer him the units. He says he rather take 816"). STAIR said ESKRIDGE could rent an apartment at 816 W. Greenfield Avenue if he had the money for it ("He can go to 816 if he can pay for it ") but, for the time being, ESKRIDGE would likely have to stay with a relative until he can save enough to rent an apartment from S2 Real Estate ("He's going to need to go to something for free for now or you can stay with his family until he's got enough money for down payment").

***February 5, 2026, TARGET TELEPHONE 3 to LOPEZ wire communication***[6]

59. As part of the investigation into the DTO, and undercover agent (UC) rented a trap house from STAIR. The UC paid STAIR for the rental and UC #2 (another undercover agent) went to S2 Real Estate to pick up the keys. Prior to this interactions, STAIR called LOPEZ to discuss the new drug trafficking rentals.

60. On February 5, 2026, at approximately 11:50 a.m., STAIR, using **TARGET TELEPHONE 3**, called LOPEZ at TARGET TELEPHONE 1.

> **STAIR**: "Hey, um… [CS #2] introduced me to this guy who's I think a dealer in…the…what do you call it? The…the mobile home park."
> **LOPEZ**: "Okay."
> **STAIR**: "And he wants…he wants a house for like him when he's like in the area…And he claims he's not going to be selling out of it or anything, he just wants it to kinda be there…like a base or something."
> **LOPEZ**: "Okay."
> **STAIR**: "Uh, I was thinking of like 5th Stre–, 5th Place. And he's cool with anything."
> **LOPEZ**: "Oh, they're not gonna want to go there."
> **STAIR**: "Uh…what?"
> **LOPEZ**: "They're not gonna want to go there."

[6] Court authorized wire intercepts for LOPEZ's TARGET TELPHONE 1 and TARGET TELPHONE 2 expire on February 14, 2026 (25-AP/8 1st Ext). Case agents are not seeking a further extension of TARGET TELPHONE 1 and TARGET TELPHONE 2 and agree that all interceptions over TARGET TELPHONE 1 and TARGET TELPHONE 2 will cease upon the court signing the extension for TARGET TELEPHONE 3. Further, case agents will not seek to renew TARGET TELPHONE 1 and TARGET TELPHONE 2 during the 30-day interception period for TARGET TELPHONE3 1st ext. Therefor there will not be concurrent intercepts of TARGET TELPHONE 1, TARGET TELPHONE 2, and TARGET TELPHONE 3 for the request authorized period.

**STAIR**: "Oh, no that's just their, I mean, it's just their base. I, I don't know if anybody's really gonna live there."
**LOPEZ**: "Oh…"
**STAIR**: "I told him that they can't be selling out of there or anything."
**LOPEZ**: "Yeah, that's not a good area to…I don't know. If nobody's gonna be livin' there, do you get what I'm sayin'? That's crack-head city, they're gonna try to break into his shit."
**STAIR**: "Yeah, well, I think somebody's gonna be there the all the time. I just…"
**LOPEZ**: "Oh, okay, okay. I was gonna say I got a, a nice unit, if it's a nice person at forty-six thirty-five just came up."
**STAIR**: "Uh, well no, I don't…I don't think he…I–I think he's gonna be doing a business out of it."
**LOPEZ**: "Oh. Yeah, yeah. Uh–oh, oh! Wow."
**STAIR**: "So, I don't think they're gonna be having customers come but…"
**LOPEZ**: "Sam! If [CS #2] talks to you, don't talk about any of that kind of stuff on the phone. He wants to talk, 'You talk to me face-to-face.' 'Cause that…don't incriminate yourself, ever."
**STAIR**: "Yeah, yeah. He's gonna…"
**LOPEZ**: "Just, just a suggestion. Say, 'I don't do that…' You know. Just F-Y-I."
**STAIR**: "Yeah, and…I think he even knew that 'cause he like came to the office and then he referred this guy like, 'Oh, a friend of mine's lookin' for an apartment.'"
**LOPEZ**: "Yeah. Okay."
**STAIR**: "But, I don't know. So, he's um…he sent me like sixteen hundred on Zelle or whatever and then I told him he still gotta put it under somebody's name and [U/I]."
**LOPEZ**: "Right."
**STAIR**: "And uh… he's gotta get power and stuff for when he's already really doing it so…I guess we could try it, if we still haven't rented one of those places."
**LOPEZ**: "Okay. Sure."
**STAIR**: "See how it goes and if he's, you know, 'causes drama…um…I guess…"
**LOPEZ**: "And now that I gotchu on the phone, I didn't text you yesterday. Okay, we'll see. But yeah, they'll have to come in." There was then a further conversation concerning other housing issues going on at the time.

61. Case agents believe this call was a reference to UC communicating with STAIR about renting an S2 Real Estate-owned property on South 5th Place for the purpose of drug trafficking. The UC sent STAIR $1,600 via Zelle earlier this same day for this rental property. There was then an email intercepted on TARGET TELEPHONE 3 confirming that the $1600 sent to the Charles Schwab Account. STAIR informed LOPEZ that he planned to rent a property to a drug dealer, the UC ("[CS #2] introduced me to this guy who's I think a dealer"). STAIR

told LOPEZ that the UC was not going to be selling drugs out of the property, but would only use to store and/or process narcotics in it ("he's not going to be selling out of it / he just wants it to kinda be there…like a base or something"). Based on my training, experience, and investigation into STAIR, his statement claiming the UC would not be selling drugs out of the property, appeared to be consistent with STAIR attempting to evade possible law enforcement detection or have others around him hear information STAIR was activity seeking drug traffickers to work with to obtain money. As described in paragraph 64 above, STAIR discussed how another drug trafficker, consistent with MCDADE, was engaged in renting trap houses and got caught because MCDADE was engaged in too much attentions at the rentals ("And then he, you know, he got busted <laugh> because he was having too much activity, like going in and outta these places and, you know, you can't, you can't do that. And then there's certain ones that we like, you know, like, Hey, this is gonna be a place where there's no activity, you know, that you don't bring crack heads to or, you know, you know, and just be whatever. But you don't bring all those folks over there. And he was just bringing all these folks to all the places and it just, it backfired on him.") Therefore, STAIR warns the UC to be careful in drug trafficking from the rental properties, but never specific told the UC to not engage in drug trafficking, as STAIR described to LOPEZ. ("Yeah, pretty much. So like, um, I mean, we got a couple places open around fifth place, um, that's kind of open and I think there's a lot of activity over there and um, you know, if we had somebody that managed the unit well and didn't make a mess of it, you know, and just, uh, kept people away at, you know, whenever, you know, you just don't want to draw so much attention to it. Like this other idiot did") Based on training, experience, the investigation into STAIR and the overall context of the call between the UC and STAIR engage

in drug trafficking, I believe the statement “activity” refers to drug trafficking, selling controlled substances to drug users. Further, STAIR specifically tells the UC to come to the office and make it appear he is a legitimate, “normal renter”, which would be consistent with attempting to evade others attention about STAIR’s own involvement in drug trafficking. STAIR recognizes that the property is likely to not actually be used by the UC (“you can kind of just rent it out yourself or whatever”), but again warns the UC to not draw the wrong attention which would get the UC busted (“keep it under control”). STAIR even goes as far as providing the UC advise on how to operate the trap house and how to evade law enforcement. (**UC**: Alright. So All right. Upper, upper, lower shit. Like, I could, could I even stay? You're saying I could stay in the upper and I could work, work outta there as long as I don't go crazy Right. And I don't Right, right. Much. **STAIR**: Yeah, that'd be perfect actually. Then you'd be, you know, in probably a good area and then, you know, probably don't draw attention there, you know, obviously go down the road or whatever and meet people or whatever, but <laugh>; and **STAIR**: But you know, because the other guy, that's what he screwed up is they, you know, they brought him right back there and then he knew where to find him. <laugh>.) Based on training, experience, and the investigation, STAIR’s statements are consistent with him ensuing the DTO can continue to be profitable, to ensure STAIR continues to make money. Therefore, based on my training, experience, and investigation into the DTO, though STAIR indicates the UC will not be engaged in drug sales out of the rental property, it appears STAIR’s statement are contrary and an attempt to evade detection. Instead, STAIR’s statements to the UC were consistent with STAIR encourage drug trafficking and providing this specific location due to the high number of drug users in the area and protection STAIR could provide. Further in the February 5, 2026 call with

LOPEZ, STAIR advised that he planned on having the UC rent a property on S. 5th Place ("I was thinking of like 5th Stre- 5th Place"), but LOPEZ did not think the UC would like that area ("They're not gonna want to go there" / "That's crack-head city, they're gonna try to break into his shit"). STAIR confirmed that the UC was going to utilizing the property to run a "business," which is trafficking narcotics ("I think he's gonna be doing a business out of it"). LOPEZ did not like that STAIR was talking so openly about knowingly renting to a narcotics trafficker and encouraged STAIR to be more careful ("don't talk about any of that kind of stuff on the phone"), because STAIR was implicating himself in illegal activity ("don't incriminate yourself, ever"). STAIR confirmed that UC sent him $1,600 via Zelle ("he sent me like sixteen hundred on Zelle").

62. At 9:52 am, LOPEZ, using **TARGET TELEPHONE 2**, called CS #2. After CS #2 answered the phone, LOPEZ asked, "So you introduced Rick [UC] to Sam after I told you not to?" LOPEZ repeated herself then stated again, "I told you not to do it that way and you did it anyway. So now this is the problem. Sam took some money from Rick [UC], but the problem is, um, yeah like the whole process. Remember, like, the email and all that stuff and Sam's like, 'Get the ID from Jacob [UC #2].' And Jacob's [UC #2] like, 'Hey I'm just like a messenger.' And then I called the guy Rick [UC], but Rick [UC] doesn't answer." CS #2 asked, "My guy?" LOPEZ replied, "The guy, yes. Rick doesn't answer. The problem is, is you gotta have, remember, where yours is it's electricity included so we didn't have to do WE Energies and all that shit? But this building is not. This is a duplex, so you'll have to get power on and all that shit. Did nobody think of that? Like, I did the thinking for you the last time, you get what I'm saying? So, I, I don't think…Sam's like, 'Get an ID and have him do the application.' And

Jacob's [UC #2] like, 'I'm not doing that shit, 'cause I'm, I'm not here for that.' And then, um, and then, ah, the guy Rick doesn't answer, so I was like, 'I can't move forward 'cause we can't even put him in the system without…,' remember without the fucking email and all that shit? I ain't doing that shit bro. I ain't doing no extra work I don't get paid for." CS #2 then stated that this was between STAIR and Rick [UC] and that CS #2 had nothing to do with their agreement. CS #2 stated that all CS #2 did was refer Rick [UC] to STAIR. LOPEZ said, "I'm just gonna give him his key and then they're gonna have to deal with this shit, and then, yeah. I'm not dealing with it".

63. Case agent believes that LOPEZ is telling CS#2 that she did not wish for people to go through STAIR for drug houses. LOPEZ states she did not wish for them to do things in this manner because she is not able to deal with some of the issues that arise ("remember without the fucking email and all that shit?"). Case agents know from the previous "drug stash rental" that was paid for by CS#2 that LOPEZ was taking 15% of the drug proceeds and she fabricated emails to assist CS#2 in the process. Due to the fact that CS#2 introduced STAIR to this particular drug dealer and LOPEZ was not involved in the rental, LOPEZ was upset she was not able to extort her 15% payment ("I ain't doing no extra work I don't get paid for").

**Intercepted Wire and Electronic Communications Money Laundering / Fraud / Drug Trafficking – STAIR using TARGET TELEPHONE 3 and LOPEZ using TARGET TELEPHONE 1**

64. On February 16, 2026, at approximately 9:03 a.m., STAIR's TARGET TELEPHONE 3, received an electronic message from LOPEZ's telephone (414) 439-8361 **TARGET TELEPHONE 1**. This message read, "Where's my check?" At approximately 9:23 a.m., STAIR's telephone TARGET TELEPHONE 3, sent an electronic message to LOPEZ's

telephone (414) 439-8361 **TARGET TELEPHONE 1** which read, "I think, I had a cash envelope for you. I must have put it in my bag." At approximately 9:23 a.m., STAIR's TARGET TELEPHONE 3, sent another electronic message to LOPEZ's telephone (414) 439-8361 which read, "Oh I left it under my printer."

65. On February 16, 2026, at approximately 9:23 a.m., STAIR using TARGET TELEPHONE 3, called LOPEZ at (414) 439-8361 **TARGET TELEPHONE 1**. STAIR asked, "Hey, can you check under my printer? I think I left your… Because I, I remember putting your money in an envelope. Did I put it under the printer?" LOPEZ replied, "I don't know." STAIR continued, "Otherwise, check my keyboard and in my drawer. 'Cause I don't see it on me, which kind of sucks." LOPEZ said, "You got a rebate under there." STAIR asked, "A rebate under there?" LOPEZ confirmed. STAIR asked, "How 'bout under my keyboard?" LOPEZ advised, "Okay, I see it. It, it was under the …" STAIR asked, "It was under the keyboard?" LOPEZ countered, "Yup, it was under the printer. No, printer." STAIR stated, "Oh…oh it was! Ok, cool! For you?" LOPEZ confirmed. STAIR said, "Okay, I think that was the only one I had left."

66. Based on the investigation to date, case agents know LOPEZ is an employee of STAIR's at S2 Real Estate Real Estate, but they also use the business to engage in drug trafficking and to clean drug trafficking proceeds, provided by drug traffickers which STAIR and LOPEZ rent trap and stash houses to assist the drug traffickers. Therefore, case agents believe LOPEZ texted STAIR where her paycheck was ("Where's my check?"). STAIR indicated via text that he put cash in an envelope for LOPEZ ("I had a cash envelope for you") and thought he placed the envelope underneath the printer or his keyboard in the office ("Oh I left it under my

printer."). Eventually STAIR calls LOPEZ and they speak to one another to locate the cash payment. LOPEZ, found the envelope with cash underneath the printer ("Yup, it was under the printer"). Based on training, experience, the investigation into the DTO, and review of court authorized wire intercepts, I believe that STAIR, in lieu of paying LOPEZ her wages via check, paid LOPEZ in cash to circumvent tax implications for himself and/or for LOPEZ and to assist in cleaning drug trafficking proceeds. Based on the case agents training and experience, payments in cash in an envelope is typically indicative of someone doing work "off the books", i.e. work that is to be undocumented, meaning individuals attempting to hide funds from state and federal departments/officials. LOPEZ is a legitimate employee of STAIR at S2 Real Estate and therefore, her pay should be via payroll and not an envelope of cash stashed in a bag or under a printer, i.e. "off the books". I am further aware that payments "off the books" is done when the individual is engaged in illegal activities and attempting to evade law enforcement agencies. Further, based on my training, experience, and investigation into this DTO, I know that LOPEZ's role includes both legitimate work and illegitimate work. LOPEZ's legitimate work has been identified as assisting in renting properties to drug traffickers to be used for trap house and/or stash house; assisting in warning drug traffickers of law enforcement investigations; dispatching drug traffickers to residences to deal with drug customers or removing other tenants illegally; and collecting additional fees from drug traffickers for S2 Real Estates assistance in supporting the drug traffickers and their operations. Based on my training and experience, an individual making payment for actions that are illegitimate would not want such payments to be documented, and are therefore, make such payments "off the books", in a manner consistent with cash hidden in an envelope out of sight. It is also of note that this envelope was hidden out of

sight instead of being locked in a safe where other legitimate money might be kept secure, as it is only for LOPEZ to see and know about this payment.

67. As part of the investigation into the DTO, case agents made contact with S2 Real Estate regarding CS #2 undercover stash house that was rented. On March 9, 2026 Milwaukee Department (MPD) Police Officer, acting on behalf of case agents, spoke via telephone with office staff at S2 Real Estate requesting the rent rolls of apartments managed by S2 Real Estate in the area of S 23rd St and W College Ave, Milwaukee, Wisconsin. MPD officer first made contact with LOPEZ at approximately 9:30 AM. LOPEZ advised she would send the list of tenants, but first needed to get permission from the owner of the business, STAIR. LOPEZ never responded to the request, so MPD officer then followed up later at approximately 2:45 PM. Officers were notified that LOPEZ had already left the office. MPD officers contacted a female in the office, who advised she made note of the matter and would have someone reach back. There was an intercepted call between STAIR and LOPEZ after this MPD officer's request regarding the rent roll for CS #2's undercover stash house. STAIR and LOPEZ did not discuss this matter, but rather had a short conversation about checks to be issued concerning a building fire from the previous month. On March 10, 2026, telephone toll analysis revealed there was a call from LOPEZ to STAIR at **TARGET TELEPHONE 3** at 9:30 a.m. The duration of the call was 2 minutes and 32 seconds. This was followed by several text messages from STAIR to LOPEZ. However, due to an equipment malfunction, case agents were not able intercept this communication. MPD officers have not received any further information at this point. While case agent are not able to confirm this from the current information, case agent believe that this call was likely concerning the ongoing request of police for the rent rolls at the two buildings

managed in the area of S 23rd St / W College Ave, of which one of the buildings is a known "drug stash location", rented by CS#2 for the purpose of storing illegal drugs. This is further supported by a wire intercept that occurred later on March 10, 2026, described below.

68. Case agents intercepted a call on March 10, 2026, at approximately 11:34 a.m., from LOPEZ using (414) 439-8361 **TARGET TELEPHONE 1** to STAIR, at TARGET TELEPHONE 3. Based on training, experience, and the investigation into the DTO, case agents believe this call was consistent with STAIR and LOPEZ engaged in withholding information from law enforcement regarding drug trafficking.

| | |
|---|---|
| **STAIR**: | Hey, how's it going? |
| **LOPEZ**: | Hey, Sam. |
| **STAIR**: | Hey. |
| **LOPEZ**: | So, the… District 6 called saying that they spoke with you couple of weeks ago about gettin' uh…um…a rent roll for 6290 and 2250 West College. He said he went on vacation but you never sent the info. |
| **STAIR**: | Oh…okay, I think I forgot. Um… |
| **LOPEZ**: | [MUMBLES] Okay. |
| **STAIR**: | Yeah, I think they were…they were investigating somebody on…on–in like Ruth's building or in our building or something? |
| **LOPEZ**: | He said just give… rent roll for both 'cause they're not sure. |
| **STAIR**: | Okay. |
| **LOPEZ**: | [AUDIO BREAKS] … I guess, I don't know. [BACKGROUND: NOISE] But…<br>[VOICES OVERLAP] |
| **STAIR**: | I think it's– |
| **LOPEZ**: | …Um, I told–I told him you were on vacation too, so…um, I guess, as long as you say, "Okay," then I can work on that for you and send it. |
| **STAIR**: | Yeah, I would just remove everything other than like… [SMACKS LIPS] I don't know…<br>[VOICES OVERLAP] |
| **LOPEZ**: | Sending just first, last name and their unit? |
| **STAIR**: | Yeah, probably.<br>[BACKGROUND: NOISE] |
| **LOPEZ**: | Okay. |
| **STAIR**: | You wanna Google if that is legal for us to just give that? Is it?<br>[BACKGROUND: TYPING SOUNDS THROUGHOUT CONVERSATION] |

**LOPEZ**: Oh yeah, absolutely. [BACKGROUND: UM: (U/I)]
**STAIR**: Yeah, that if we're supposed to give it or if they're supposed to get a warrant or something? Uh…
**LOPEZ**: Hm… [BACKGROUND: CHIMES]
**STAIR**: If there is anybody there that's um…there's nobody that's an illegal there, is there? I don't want to accidentally help ICE out or some…or something.
**LOPEZ**: I don't think District 6 will come for ICE. I think that'll be a whole different department. [CHUCKLES]
**STAIR**: Yeah. [ECHOES]
[VOICES OVERLAP]
**LOPEZ**: I think… [AUDIO BREAKS]
**STAIR**: Well, they might re…request stuff though. Through them.

69. After this portion of the call there is a further conversation regarding a female that was denied rental at a location. At the end of the interception LOPEZ can be heard for a moment after STAIR hangs up and appears to be making searches regarding whether landlords can provide information to law enforcement.

70. Based on my training, experience, and investigation into the DTO, I believe this call was consistent with LOPEZ and STAIR working together to try to evade law enforcement's investigation into drug trafficker (CS #2), in which STAIR and LOPEZ knowing rent properties to and collect fees from the drug traffickers for allowing the drug traffickers to use the properties for drug trafficking, assisting in providing false names on the rentals, and notifying drug traffickers about law enforcement detection. Specifically, during the call, LOPEZ discusses with STAIR the rent role from one of the residences CS #2 rented from S2 Real Estate to be used as a stash house (So, the… District 6 called saying that they spoke with you couple of weeks ago about gettin' uh…um…a rent roll for 6290 and 2250 West College. He said he went on vacation but you never sent the info.). STAIR details to LOPEZ that he believes law enforcement are attempting to investigate a person at the location, referring to the building CS #2 may have rented for the stash house (Yeah, I think they were…they were investigating somebody on…on–

in like Ruth's building or in our building or something?). STAIR is hesitant to provide the information to law enforcement (Yeah, I would just remove everything other than like… [SMACKS LIPS] I don't know…) and tell LOPEZ to research if they legally have to provide the information ("You wanna Google if that is legal for us to just give that? Is it?" and "Yeah, that if we're supposed to give it or if they're supposed to get a warrant or something? Uh…"). LOPEZ agrees and appears to search the internet for information ("Oh yeah, absolutely."). STAIR also discusses Homeland Security attempting to deport illegal immigrants (STAIR "If there is anybody there that's um…there's nobody that's an illegal there, is there? I don't want to accidentally help ICE out or some…or something."); however, LOPEZ points out that the local law enforcement is engaged in deportation ("I don't think District 6 will come for ICE. I think that'll be a whole different department. [CHUCKLES]") and STAIR agrees ("Yeah."). Based on these additional statements, I further believe LOPEZ and STAIR are concerned about their drug trafficking operation and providing information to law enforcement regarding their DTO. This is further consistent with an email later sent, in which LOPEZ and STAIR provide a false rent role for CS #2, as described below.

71. Shortly after, at approximately 11:45 a.m., LOPEZ using (414) 439-8361 **TARGET TELEPHONE 1** called STAIR, at TARGET TELEPHONE 3. Based on training, experience, the investigation into the DTO, and the statements made in the prior intercepted call, I believe this call further demonstrates STAIR and LOPEZ attempting to assist those they know to be engaged in drug traffickers (CS #2), by trying to withhold information from law enforcement.

**STAIR**: Hey, how's it goin'?

**LOPEZ**: You are not prohibited to give the law enforcement anything, but however…
**STAIR**: Uh-huh…
**LOPEZ**: You should be very cautious, but you're not required. No.
**STAIR**: To give it? Okay.
**LOPEZ**: Yup. But [U/I] ...
[VOICES OVERLAP]
**STAIR**: I would um….
**LOPEZ**: …Does, if it says, "Voluntary disclosure" landlord can cooperate with the police or whatever, without a warrant but their…um…yeah. So…
**STAIR**: I think we might as well because it's not we are trynna… the only people I would try to protect is someone that's…that…
[VOICES OVERLAP]
**LOPEZ**: Well in that area, I just say if they're…if they're doin' some criminal stuff over there, then maybe you should [AUDIO BREAKS] …
[VOICES OVERLAP]
**STAIR**: They'll move it out for us.
**LOPEZ**: … stop [PH] the process, 'cause you don't want that shit over there, in that area.
**STAIR**: Nope, nope we don't.
**LOPEZ**: Okay.
**STAIR**: So, yeah. I'll just send them a list. Just… um…
**LOPEZ**: So, just um…
[VOICES OVERLAP]
**STAIR**: I would remove like rent amounts, and move-in dates and I don't know.
**LOPEZ**: Just the unit and contact. Like unit and this person…
[VOICES OVERLAP]
**STAIR**: Yeah, probably.
**LOPEZ**: Okay.
**STAIR**: And maybe the move-in date, if it's a recent one.
**LOPEZ**: Okay, I got it.
**STAIR**: 'Cause they may want to see if there is someone new that is causing trouble…trouble. You know what it could've been, maybe somebody had access to that guy that we kicked out?
**LOPEZ**: Uh-huh.
**STAIR**: Maybe somebody was using his apartment while he wasn't there.
**LOPEZ**: I don't know, he had so much shit. He was gonna come back like, "Where the fuck did all my shit go?" "I…I stored it for a while."
**STAIR**: Yeah, did anybody contact him? What did he say?
**LOPEZ**: [BACKGROUND: UM: (U/I)] [ASIDE: Okay, wait hold.] Um…there was no way to contact him. [BACKGROUND: TYPING SOUNDS]
**STAIR**: Oh.
**LOPEZ**: [ASIDE: Alberto?] [GRUNTS]
**STAIR**: Yeah, I think he contacted me once, somehow.

**LOPEZ**: Yeah.
[PAUSE]
**STAIR**: But he was supposed to give us a check uh… weeks ago.
**LOPEZ**: Yeah, I know.
**STAIR**: Or he was supposed to follow-up with me weeks ago, so…
**LOPEZ**: A'right.
[VOICES OVERLAP]
**STAIR**: His own loss.
**LOPEZ**: And then what was the last thing? And Kristalee… I threw all her shit away. After they…
[VOICES OVERLAP]
**STAIR**: Yeah, that's fine.
**LOPEZ**: … they broke in. Oh, okay. 'Cause she keeps on calling like, "Sam says I can…where's my stuff? Where's my stuff?" Like, "You're two weeks too late, sweetheart."
**STAIR**: Yeah, she must have just got through rehab or something.
**LOPEZ**: Okay. [CHUCKLES] I doubt it.
**STAIR**: [LAUGHS]
**LOPEZ**: [LAUGHS] A'right.
**STAIR**: Or at least started on her meds.
**LOPEZ**: Great. Fair enough.
**STAIR**: A'right.
**LOPEZ**: I'll get this over then. A'right, thanks. Bye.
**STAIR**: Okay, bye.
[END OF CONVERSATION]

72. Based on training, experience, and the investigation into the DTO, case agents believe this call is consistent with STAIR and LOPEZ engaged in assisting drug traffickers by renting locations for trap houses and stash houses and attempting to assist the drug traffickers by not turning over information to law enforcement, limiting the information, and/or discussing providing notice to the drug traffickers; therefore, impeding drug trafficking investigations. This is later confirmed when LOPEZ provides the false name for CS #2's stash house (described in more detail below). Case agents know that STAIR and LOPEZ believed the building in question was in fact used as a "stash" location for illegal drug by CS#2. Case agents believe that the discussion of STAIR and LOPEZ concerning "maybe somebody had access to that guy we

kicked out", is about controlled substances stash inside a residence at the building that someone may have used ("Maybe somebody was using his apartment while he wasn't there.") Case agent believes that STAIR and LOPEZ are discussing someone they know who would be able to generate a complaint to do with narcotics traffic. Case agent further believes that they are inferring someone was able to get to his "stash" and generate a complaint like this as a result.

73. Case agents further believe their conversation relates to concerns about known drug trafficking at the property, based on statements regarding "Kristalee". Based on training, experience, and the investigation into the DTO, case agents believe LOPEZ was describing to STAIR that LOPEZ threw "Kristalee's" controlled substances away from inside a residence. ("And Kristalee… I threw all her shit away. After they…" "they broke in. Oh, okay. 'Cause she keeps on calling like, "Sam says I can…where's my stuff? Where's my stuff?"). Based on training, experience, the investigation into the DTO, and STAIRS statements regarding "Kristalee" going to rehab, case agents believe "stuff" is a reference to controlled substances not just items within a residence ("Yeah, she must have just got through rehab or something."). This is further supported by LOPEZ's statement of disbelief, which is why case agents believe "Kristalee" is a drug user and looking to obtain her controlled substances back that were located inside her residence. Additionally, case agent knows that when CS#2 rented a stash location from S2 Real Estate at 6290 S. 23 Street, Milwaukee, Wisconsin, CS#2 never signed a lease and placed the paperwork under a false name. STAIR and LOPEZ never speak about Unit # 8 during this conversation, which was the unit rented by CS#2. It should be noted that STAIR was aware of this rental made by CS#2 because CS#2 paid STAIR directly when this apartment was initially rented, and STAIR followed up with contact to CS#2 regarding a lease signature for this

Unit#8. LOPEZ was also aware of CS#2 having the keys to 6290 S 23rd St, Unit #8, Milwaukee, Wisconsin as she took two payments of $2,500.00. LOPEZ took these payments believing them to be 15% of the drug proceeds from the rental, which was paid to her for the service of concealing his name from the documents, as well as taking rental payments.

74. Case agents believe STAIR is cognizant that his business is known to allow tenants to utilize sublets and false documents so as to conceal information from investigators, like when he allowed CS #2 to rent a location for the purpose of a stash house and CS #2 used a false name. Case agents believe that is why he makes mention to LOPEZ concerns about providing detailed information for one person (STAIR: I think we might as well because it's not we are trynna… the only people I would try to protect is someone that's…that… ). Case agent believes that STAIR and LOPEZ are likely discussing CS #2 in regards to protecting someone and not someone that ICE would be looking for instead, given LOPEZ discuss that District 6 would not be looking for someone for deportation (I don't think District 6 will come for ICE. I think that'll be a whole different department. [CHUCKLES]). Further, case agent knows from the previous investigation that LOPEZ states to STAIR never to speak about certain matter over the phone and never to "incriminate" himself. LOPEZ therefore would not mention Unit #8 or CS #2 over the phone.

75. On March 11, 2026, law enforcement contacted S2 Real Estate Office public listed number (414-476-6063) regarding a list of those renting at 6290 S 23rd St, Milwaukee Wisconsin and 2250 W College Ave, Milwaukee, Wisconsin, both properties managed by S2 Real Estate. This was again a follow-up concerning an anonymous narcotics complaint for that area of S23rd St / W College Ave. At approximately 10:44 a.m., case agents received an e-mail

from S2 Rentals which contained false information about the renter in 6290 S. 23rd Street Unit #8 (CS #2):

> **From:** S2 Rentals <Rentals@s2support.com>
> **Sent:** Wednesday, March 11, 2026 10:44 AM
> **To:** Kuspa, Gregory <gkuspa@milwaukee.gov
> 8 2/1 Labubu Mohammad Occupied 1,000 12/01/2025-05/31/2026

76. The email provided by S2 Real Estate revealed that both buildings were 8-unit apartment complexes and they provided renter information for all 16 units. The name associated with the Unit #8 at 6290 S 23rd St, Milwaukee, Wisconsin was "Labubu Mohammad". This was the unit rented by CS#2 under the auspices that CS#2 would use this apartment to further CS#2's drug trafficking activities. Therefore, this email confirms that STAIR and LOPEZ have documented the listing of Unit # 8 falsely to protect a drug dealing tenant (CS #2). STAIR and LOPEZ both took payment from CS#2 on separate occasions for this rental. As described in previous affidavits, on December 4, 2025, CS#2 met with case agents and was searched for contraband and money. Case agents confirmed there was nothing illegal on their person and CS#2 was given $2,150.00 to make payment for rent and security deposit at the S2 Real Estate building to STAIR. CS#2 was to make payment security deposit and one month's rent (month of December, 2025) for the apartment at 6290 S 23 St Unit #8, Milwaukee, Wisconsin. CS#2 was also equipped with a hidden recording device during this meeting with STAIR and CS#2 then engages in conversation with STAIR about making payment for the Apartment # 8 at 6290 S 23 St, Milwaukee, Wisconsin. CS#2 can be heard asking STAIR count the $2,150.00 so as to not get a call later that he owes money.

77. As also described in previous affidavits, CS#2 returned to the S2 Real Estate building in the same manner as described above with no money or contraband on their person only equipped with a hidden recording device on Monday December 8, 2026. CS#2 met with LOPEZ at this time and arranged for the apartment to be placed under the name "Labubu Mohammad", which was made up by himself and other employees while in the building, and was given the keys to the residence 6290 S 23rd St for Unit #8. Case agents know that LOPEZ knows CS#2's true identity because case agents have intercepted numerous calls wherein LOPEZ utilizes CS#2's real name.

78. Based on training, experience, and the investigation into the DTO, including the above described telephone calls between STAIR and LOPEZ discussing not providing rent roll information to law enforcement, and case agents finally receiving the rent roll with false information as to CS #2, case agents believe this email with the name of "Labubu Mohammad" is evidence of LOPEZ and STAIR creating a fraudulent documentation so as to protect a drug stash location and a drug trafficker from the police investigation. STAIR knows from recorded conversations that CS#2 is the renter of Unit #8 and did not make any attempt to notify the police of this when a "narcotics" complaint was announced to STAIR at S2 Real Estate by law enforcement on February 25, 2026. It should be noted that on January 6, 2026, at 2:06 p.m., TARGET TELEPHONE 3 sent a message to CS#2to request CS#2 "sign that lease for number eight". Case agent also knows that LOPEZ was present when the false name and documentation was created for 6290 S 23rd St, Unit #8 and made no attempt to notify the police when they spoke to LOPEZ. LOPEZ also took an additional $5,000.00 in payment to protect the CS#2 from police investigation as well. It is also significant that it is only after receiving permission from STAIR

that LOPEZ is willing to send this information to police. Case agent believes that STAIR and LOPEZ coming to the agreement concerning if they should send the email is an overt act to protect drug traffickers and themselves from police investigation by use of fraud.

79. Further, case agents queried the WIDOT for the name of "Labubu Mohammad" as well as Mohammad Labubu and found no names in the system matching.

**Additional Intercepts/Jail Calls and Investigation into DTO Telephones**

80. On March 10, 2026, at approximately 2:12 p.m., LOCKETT, at (414) 324-5384, received a call from Jaylen HART, an inmate at Dodge County Correctional Facility using IC Solution's general jail number, (920) 239-5580.

| | |
|---|---|
| **HART**: | What you on though? You at, you at the crib, chillin'? |
| **LOCKETT**: | Hell yeah. I was up catching my action. I got back, smoked a little bit, passed out. I'm up now, though. |
| **HART**: | Hey, keep it one hundred. That shit ain't been moving how it was before you went in there? |
| **LOCKETT**: | It's still moving, just ain't moving as fast. |
| **HART**: | On what. |
| **LOCKETT**: | Hell yeah. Still get the shit gone. It just, it ain't, it ain't…I ain't got all the people I had it, like I had at first. And I don't be out here like that, 'cause it's cold. |

81. Based on training, experience, and the investigation into LOCKETT DTO, case agents know that "action" is often coded language often used by drug traffickers to refer to dealing controlled substances. Therefore, case agents believe HART asked if LOCKETT was at home, and LOCKETT advised that he was selling controlled substances ("I was up catching my action"), then got back home, smoked, and fell asleep. HART then asked if drug-dealing was as profitable as it was before LOCKETT was incarcerated ("That shit ain't been moving how it was before you went in there?"). LOCKETT confirmed he was still able to sell controlled substances, but it was just slower than before ("It's still moving, just ain't

moving as fast"). LOCKETT further advised that he was not selling as much as he used to because it had been cold outside ("And I don't be out here like that, 'cause it's cold").

82. On April 2, 2026, case agents intercepted several phone calls between STAIR, at **TARGET TELEPHONE 3**, and an Unidentified Male (UM) at (414) 403-1341. These calls pertained to an individual named Nathaniel who was renting an apartment from S2 Real Estate, and with whom the UM was familiar. STAIR informed the UM that S2 Real Estate received information that Nathaniel was allowing numerous drug users inside his apartment, which was contrary to the terms of the rental agreement signed by Nathaniel. STAIR urged the UM to speak with Nathaniel and ensure that no other persons were allowed inside Nathaniel's apartment since Nathaniel was the only person listed on the lease. One of these calls occurred at approximately 3:17 p.m., when STAIR, at **TARGET TELEPHONE 3**, received a call from the UM using (414) 403-1341. The conversation ensued as follows:

| | |
|---|---|
| **STAIR**: | So, I don't even– I was just talking to the two (2) drug dealers the other day and I was like, "I don't care if you guys are dealing drugs. The problem is– is you guys are doing it so openly…" |
| **UM**: | [SCOFFS] |
| **STAIR**: | "…That the neighbors are afraid to come outside. You're bringing all your clients over here. And everything else." And so… You know… I– I was honest with 'em and like, "You don't have to deny it, I honestly don't care, but you're gonna get raided." And when I was talkin' to the guys and one (1) of 'em– couple of 'em were honest enough that they just, they took my advice and left because they saw the other people got raided. And I kinda bluffed 'em and said, you know, "Hey, we got a, a, you know, a, a notice from the city that they're gonna raid you next. I don't know when." But… I mean they– it– it's kinda crazy because they just, they get in this mode where they just think what they're doing is– is fine. And then they get in this chronic lie where they never admit the truth, and they just stick to the lie until the bitter end. |
| **UM**: | Uh. Yup.<br>[VOICES OVERLAP] |
| **STAIR**: | It's crazy, but oh, well! |

**UM**: Okay. Very good. Okay. Yup, yup, yup.

83. Case agents believe STAIR informed the UM that STAIR did not care if Nathaniel wanted to use drugs inside his S2 Real Estate-owned apartment. In fact, STAIR even advised that he did not care if people trafficked narcotics inside an S2-owned property and that STAIR only cared that people who use or sell narcotics do so more discretely. STAIR intimated that Nathaniel could still use drugs in his apartment, STAIR just did not want Nathaniel to allow other individuals to stay in the apartment.

84. On Tuesday April 7, 2026, at approximately 11:53 a.m., STAIR, using **TARGET TELEPHONE 3**, called Antone ROSS at (414) 807-8198. The conversation ensued as follows:

**STAIR**: [ASIDE: On Michigan?] [BACKGROUND: LOPEZ: (U/I) last night.]
**ROSS**: Yeah, Sam.
**STAIR**: Hey. Hey, ANTONE. Um…
[VOICES OVERLAP]
**ROSS**: [BACKGROUND: ABRAHAM: But you (U/I).]
**STAIR**: Uh-uh… Hey, I guess we need two (2)…we're givin' you two (2) options for security here. Either…
[VOICES OVERLAP]
**ROSS**: What's that?
**STAIR**: … you need to start bringing a baseball bat and or somethin'. And…and fuck some of these guys up, so they don't come back or…
[VOICES OVERLAP]
**ROSS**: [BACKGROUND: ABRAHAM: That's extra!]
**STAIR**: …or the harder one (1)… I mean it's a little harder but it's, it's the proper process. Is when you go and they're there, call the police and say, "Hey, I got some vagrants, but I need their information, so I can file a restraining order."
**ROSS**: A'right.
**STAIR**: And then you gotta wait for the cops. [BACKGROUND: LOPEZ: Yeah, but I was just (U/I).] Then they get–kick 'em out.
**ROSS**: [AUDIO BREAKS]
**STAIR**: Take their names and info and then you get the info from the cops. And they might say, "Oh, you gotta get [STAMMERS] police report or something." Then you have to…

[VOICES OVERLAP]

**ROSS**: Right, you're right. [PH]

**STAIR**: …go down there, get the forms or whatever we need and we'll fill 'em out or help you fill 'em out or do it. And then the next time they're there if you recognize the guys, then you call the police again and they'll be forced to arrest them. 'Cause then it's… [SMACKS LIPS] a violation of a restraining order.

**ROSS**: Right. Yeah, they not–
[VOICES OVERLAP]

**STAIR**: They won't just kick 'em…kick em out and says, "Oh, walk out the street; wait two (2) hours and come on back."

**ROSS**: Right, right. Uh…Yeah, about the ones…

[VOICES OVERLAP]

**STAIR**: Don't do that we're gonna have to let you go.

**ROSS**: …the ones last night, I'm thinkin'–Yeah, uh, the ones I seen last night they were all, they were all new junkies. [BACKGROUND: ABRAHAM: Yeah, if I gotta beat people up with bats and stuff I need extra money.] [CHUCKLES]

**STAIR**: I know or you hire someone like ABRAHAM that…or Jeanette she likes doing it too, I guess?

**ROSS**: [STAMMERS]

**ABRAHAM**: Cannot afford it Sam.

**STAIR**: [CHUCKLES]

**ABRAHAM**: He can't afford it.

**ROSS**: A'ight, so take, take ABRAHAM or Jeanette wit' me? [CHUCKLES]

**STAIR**: And…and uh…and, and we'll pay ya like fifty (50) bucks a head. [CHUCKLES]

**ROSS**: [LAUGHS]

**STAIR**: A broken head.
[VOICES OVERLAP]

**ABRAHAM**: Hey, Sam! Sam!

85. Case agent believes this statement : "… you need to start bringing a baseball bat and or somethin'. And…and fuck some of these guys up, so they don't come back or…" is related to STAIR's desire for ROSS to use violence to get rid of the "vagrants" that are warming up in the common hallway of one of his buildings. STAIR admits that the proper way would be the other option, which would be to call the police and identify the "vagrants" so that they can be issued a no trespass warning.

86. At this point in the call STAIR and ABRAHAM begin to speak about a basement plumbing problem and the different issues that were coming up. STAIR then comes back to the previous issue. STAIR then again addresses ROSS regarding the issue off getting rid of the "vagrants" from the building again.

87. The following is a transcript of the remainder of the conversation:

**ABRAHAM**: I'm off to Menards. I gotta go get some plumbing [U/I].
**STAIR**: So, Antone [PH] tonight.
**ROSS**: A'right.
**STAIR**: Tell Antone that it has to start tonight. So, don't kick 'em out. You'll have to just go up and um…um… You can try to ask 'em first, so you don't have to call the cops. So, just say, "Hey, do you live here? Do you have an ID to show that you live here?" [VOICES OVERLAP]
**ROSS**: Oh, a'right. [PH] A'right.
**STAIR**: And they'll–and see if you can get their ID or like, "What's your name?" Like uh… I don't know. And then if you can just take a picture of their ID. If you want you can say, "You know what if, if I can take a picture of your ID, I'll letchu stay here
**ABRAHAM**: Yeah, and I tried to take it [U/I], before he came.
**ROSS**: Them muh'fuckers ain't got no ID's. [SCOFFS] A'ight.
**STAIR**: Really? Yeah.
**ROSS**: Well is not, prolly…probably not you know everythin' they got is in a bag so…
**STAIR**: They might though, because they probably got like food card and somethings.
[VOICES OVERLAP]
**ROSS**: Yeah, they say they might they–you know they cuttin' [PH] benefits, you right benefits. [SMACKS LIPS] A'right.
**STAIR**: Yeah, so tell 'em…
**ROSS**: I gotchu.
**STAIR**: [CLEARS THROAT] So, tell 'em like, " Hey, you know, um…I understand you're having a rough time, but we're…" Say, say that our–you can bluff 'em and say the landlord gets a tax credit back if you can put your name down as someone that's uh…" You know, "He's providing heat, like housing to. Like heated hallway or something."
**ROSS**: Yeah.
**STAIR**: Just say, "Yeah, we get a tax credit if we can write down your names." And say that we're supplying [PH] you know, letting you

stay here for the–you know it's below freezing. Because tonight is gonna [STAMMERS] below freezing again.

**ROSS**: Is it?

**STAIR**: Yeah. And say, "Hey, we get a tax credit." Just say, "Hey, we get a tax credit if we letchu stay here when it's freezing, but I need your ID."

**ROSS**: [BACKGROUND: ABRAHAM: Okay, (U/I)] Right.

**STAIR**: And say, "Otherwise, I gotta kick you out."
[VOICES OVERLAP]

**ROSS**: [BACKGROUND: ABRAHAM: How 'bout– (U/I).]

**STAIR**: And then, maybe you can get their ID's that way…

**ROSS**: Right. [BACKGROUND: ABRAHAM: (U/I). Let me talk to him.]

**STAIR**: …and then you don't have to call the cops, which is nice, because… I don't know. Actually, calling the cops once isn't bad.

**ROSS**: Right.

**STAIR**: We become a nuisance if we call them every night.

**ABRAHAM**: Hey, you wanna make some money, Sam?

**STAIR**: Uh-oh.
[VOICE OVERLAP]

**ABRAHAM**: Wanna make some money?

**STAIR**: Big money?

**ABRAHAM**: I'm, I'm gonna get the product and then I'm just… they're there, I'm just gonna sell it to 'em and I'll break you off a cut.
[LAUGHS]

**STAIR**: [LAUGHS]

**ABRAHAM**: Fuck it, they're gonna be there. They're gonna be there…
[VOICE OVERLAP]

**STAIR**: You know what we should do is…
[VOICE OVERLAP]

**ABRAHAM**: … then might as…
[VOICE OVERLAP]

**STAIR**: …we can funnel them to some building we don't care about, y'know, like uh… on Fifth (5th) Street… and suddenly like, "Oh, yeah, come on pick up here."

**ABRAHAM**: Shit. [LAUGHS]
[VOICE OVERLAP]

**STAIR**: And then they'll all be there.

**ABRAHAM**: [BACKGROUND: UM: (U/I) could like, could like (U/I).] Yeah! Yeah! I'll break you off a cut. [GIGGLES]

**STAIR**: Yeah, maybe we can make it like a big crack house, where we can just uh, charge them like fifty (50) bucks a night to stay, twenty-five (25) bucks a night to stay.

**ROSS**: There you go.

**STAIR**: Uh, we, product included. [CHUCKLES]

| | |
|---|---|
| **ROSS**: | There you go. [LAUGHS] |
| **STAIR**: | [GIGGLES] Right. |
| **ROSS**: | [U/I] |
| **STAIR**: | Yeah, we're gonna be in the federal penitentiary soon. [GIGGLES] |
| **ROSS**: | [STAMMERS] And we're gonna be it through the other drug dealers. [GIGGLES] |
| **STAIR**: | I know, I know, [U/I] shooting [U/I] |
| **ROSS**: | [U/I] stole our customers! |
| **STAIR**: | [CHUCKLES] |
| **ROSS**: | I got you, Sam. |
| **STAIR**: | [BACKGROUND: LOPEZ: (U/I) upstairs…] Uh-huh. [BACKGROUND: LOPEZ: That's why I'ont just go tell anybody anything. Don't listen him, Sam.] [CHUCKLES] |
| **ROSS**: | A'right, matter of fact. A'right, a'right. |
| **STAIR**: | Alright, have a good one. [BACKGROUND: LOPEZ: You fuckin'…] So, tonight, keep me posted. |
| **ROSS**: | Yeah, a'right. |
| **STAIR**: | [BACKGROUND: LOPEZ: She gotta control buy!] [VOICE OVERLAP] If you don't cut it tonight, we're not gonna pay ya for your time.] [BACKGROUND: LOPEZ: Hear me?] |
| **ROSS**: | Hey, um. |
| **STAIR**: | Okay. [BACKGROUND: LOPEZ: She served her undercov–] [VOICE OVERLAP] |
| **ROSS**: | Give me keys to that- to that hallway though. Say I need a key to that hallway. |
| **STAIR**: | [BACKGROUND: ABRAHAM: It's gonna be…] Okay, which one? Just stop in the office and get it all… or text Devi and she'll get you everything… [BACKGROUND: LOPEZ: Twenty-three (23)… no, he said the other drug dealer is in twenty-three-forty-six (2346)] |
| **ROSS**: | Yeah. |
| **STAIR**: | [BACKGROUND: LOPEZ: Chase building still.] |
| **ROSS**: | He upstairs, he ain't never moved. |
| **STAIR**: | Okay. [ASIDE: Do we know which unit?] [BACKGROUND: LOPEZ: He can't get… I gotta send somebody over there.] |
| **ROSS**: | It's in the kitchen. |
| **STAIR**: | Okay. |
| **ROSS**: | It's in the kitchen on the table. [BACKGROUND: ABRAHAM: Oh.] |
| **STAIR**: | [BACKGROUND: LOPEZ: 'Cause he says you– you got this door and then you got this door.] Go grab one (1) of Tracy's guys to buy from 'em. |
| **ROSS**: | [GIGGLES] |

| | |
|---|---|
| **STAIR**: | [BACKGROUND: LOPEZ: It's right here. It's straight ahead.] Mm-hm. [BACKGROUND: LOPEZ: But I think he is moving. I said, go to the account. Or is he? Um, I wanna say he might be six (6). Twenty-three (23) forty-six (46). 'Cause he's… you said, not to the right.] |
| **ROSS**: | Not… |
| **STAIR**: | [BACKGROUND: LOPEZ: Correct?] |
| **ROSS**: | Not to the left, not that door to the left that goes to upstairs. Not the door… |
| **STAIR**: | [BACKGROUND: LOPEZ: Where… that person moved out already.] |
| **ROSS**: | Right, it's that– it's that door, right after that. |
| **STAIR**: | It's like… |
| **ROSS**: | On the wall. |
| **STAIR**: | …near room three (3) where the retard used to live? [BACKGROUND: LOPEZ: Six (6), it's gotta be six (6).] |
| **ROSS**: | Yeah, I think they is retarded. I think they are retarded. |
| **STAIR**: | [ASIDE: Six (6)? Oh, six (6)? Five (5) is on the other side?] [BACKGROUND: LOPEZ: No, when you walk up the stairs you have…] [ASIDE: Oh, it's up the stairs?] [BACKGROUND: LOPEZ: When you walk up the stairs, you got five (5), six (6)…] |
| **ROSS**: | Yup. |
| **STAIR**: | [BACKGROUND: LOPEZ: … seven (7).] |
| **ROSS**: | Yup. It's six (6), it's (6). |
| **STAIR**: | Oh! [BACKGROUND: LOPEZ: Right? So, basically, he said it's not on the right…] [VOICES OVERLAP] |
| **ROSS**: | It's the middle one (1). It's the middle one (1). |
| **LOPEZ**: | The left just moved out because we told… we knew that her boyfriend was sellin' drugs. |
| **STAIR**: | What's this one (1), it says, "Out five (5), one (1)?" |
| **ROSS**: | Oh, hold on. |
| **STAIR**: | Seven's (7) supposed to be out on five (5), one (1). |
| **LOPEZ**: | Seven (7) is moving out because of all the bullshit, so… |
| **STAIR**: | It must be six (6)? |
| **LOPEZ**: | That's what he's sayin', but like I told him, "I…" |
| **STAIR**: | Try to figure it out and, and, um… |
| **ROSS**: | I'll get you the ducts [PH]. |
| **LOPEZ**: | I need to know for sure. |
| **STAIR**: | Okay, cool. |
| **ROSS**: | A'right. [BACKGROUND: ABRAHAM: (U/I).] |
| **STAIR**: | A'right, thanks. Okay, bye. |

88. Case agents believe that when ABRAHAM makes the statement to STAIR

concerning how to deal with vagrants: “Wanna make some money?” and: “I’m, I’m gonna get the product and then I’m just… they’re there, I’m just gonna sell it to ‘em and I’ll break you off a cut. [LAUGHS]” that “get the product” refers to getting drugs to sell to the “vagrants” and when he states “I’ll break you off a cut” he is referring to giving to STAIR a portion of the proceeds. ABRAHAM and STAIR appear to be laughing about this idea. STAIR then states: “… we can funnel them to some building we don’t care about, y’know, like uh… on Fifth (5th) Street… and suddenly like, ‘Oh, yeah, come on pick up here.’” Case agents knows that STAIR has offered a residence owned by S2 Real Estate on S. 5th Place and W. Lincoln Avenue to someone who he believed to be a drug dealer in the past Under Cover Operation and stated that they could utilize the residence as it is close to many users. Therefore, when STAIR states he wishes to “funnel them to some building we don’t care about” he is again speaking about bringing drug users to a building that is difficult to fill with legitimate paying tenants. ABRAHAM then replies again: “Yeah! Yeah! I’ll break you off a cut. [GIGGLES]” again speaking about giving to STAIR a portion of the proceeds from the drug sales to the users at the residence. STAIR then adds: “Yeah, maybe we can make it like a big crack house, where we can just uh, charge them like fifty (50) bucks a night to stay, twenty-five (25) bucks a night to stay. “ In this statement STAIR references a way that a dealer could make money utilizing his residence as a rooming house for users. This reference is very similar to the manner in which MCDADE was believed to have made profits from housing users. STAIR then laughs: “Uh, we, product included” and again uses the word “product” to refer to drugs that are being sold. STAIR then states: “Yeah, we’re gonna be in the federal penitentiary soon.” This statement refers to STAIR’s knowledge that the conduct described would be illegal. Further, STAIR has made similar

comments during other recordings, and laughed about the statement; however, based on the investigation into STAIR and the DTO, STAIR is not joking about this illegal conduct, but instead engaging in this type of drug trafficking.

89. For the reasons detailed above, I believe that LOPEZ uses **Target Cell Phones** to engage in violations of the TARGET OFFENSES.

90. I know that persons who engage in ongoing criminal drug trafficking utilize cellular devices to further their activities. I know that traffickers utilize cellular devices to maintain contact with other affiliates and store information relating to their trafficking offenses. Case agents believed based on the ongoing investigation into the DTO that court authorized electronic surveillance of **Target Cell Phones**, will continue to assist in the investigation of the DTO. Case agents believe that the historical location data requested for the **Target Cell Phones** will continue to assist in identifying DTO stash locations and corroborating the locations of DTO members during relevant events such as the previously completed controlled buys. I believe that the call detail records requested will continue to help identify other DTO members and potential sources of supply. I believe that the requested prospective location data will continue to assist in proactive surveillance of DTO members and will aid in the identification of DTO members/suppliers, stash locations, and meeting locations.

## TECHNICAL BACKGROUND

91. Case agents believe from all the above information provided that Jeanette LOPEZ, Samuel P. STAIR, Otis LOCKETT, J.M.L., Abraham M. LOPEZ, and other persons as yet unknown continue to be involved in the distribution of illegal drugs. Case agents also believe that LOPEZ, and others continue to use **Target Cell Phones** during their illegal activities,

including communicating with known and unknown co-conspirators. Case agents further believe known and unknow DTO members, has made and will continue to make frequent visits to locations in which the DTO stores and distributes narcotics and/or pick up drug proceeds or location directed to do so by others including likely meeting drug sources. Case agents believe that the continued historical and prospective monitoring of **Target Cell Phones**' location will assist in identifying potential other sources of supply, distributors, and locations associated with the DTO.

92. I believe **Target Cell Phones**, whose service provider is T-Mobile, ("Service Providers"), contains valuable information that could be used as evidence for the distribution and possession with intent to distribute controlled substances; conspiracy to distribute and possess with the intent to distribute controlled substances; maintain drug involved premises; use of a communication facility in furtherance of a drug trafficking offense, possession of a firearm in violation of a drug trafficking offense, violations of Title 21, United States Code, Sections 841, 843(b), 846, and 856.

93. Based on my training and experience, I know that Service Providers can collect historical and prospective cell-site data and historical and prospective E-911 Phase II data about the location of **Target Cell Phones**, including by initiating a signal to determine the location of **Target Cell Phones** on Service Providers' network or with such other reference points as may be reasonably available.

94. In my training and experience, I have learned that the Service Providers is a company that provides cellular communications service to the general public. I also know that providers of cellular communications service have technical capabilities that allow them to collect and generate information about the locations of the cellular devices to which they provide

service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular device and, in some cases, the "sector" (i.e., faces of the towers) to which the device connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate general location of the cellular device.

**Cell-Site Data**

95. Based on my training and experience, I know that the Service Providers can collect cell-site data on a prospective basis about **Target Cell Phones**. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as the Service Providers typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

**E-911 Phase II / GPS Location Data**

96. I know that some providers of cellular telephone service, including Service Providers, have technical capabilities that allow them to collect and generate E-911 Phase II

data, also known as GPS data or latitude-longitude data. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers.

97. As discussed above, cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.

98. I also know that certain wireless providers, such as Service Providers, can provide precision location information, also known as estimated location records or historical handset location data, on both a historical and prospective basis. Each provider refers to its proprietary estimates of a cellular device's location differently. This information, however, is sometimes referred to as geolocation information (PING), Network Event Location System (NELOS) data, Global Positioning System (GPS) data, cell tower triangulation or trilateration, round-trip time or real-time tool (RTT), per-call measurement data (PCMD), historical E911 data, or precision measurement information.

99. Based on my training and experience, I know that Service Providers also can collect per-call measurement data, which Service Providers also refers to as the "real-time tool" ("RTT"). RTT data estimates the approximate distance of the cellular device from a cellular tower based upon the speed with which signals travel between the device and the tower. This

information can be used to estimate an approximate location range that is more precise than typical cell-site data.

100. Accordingly, cell-site data is typically less precise than E-911 Phase II data. Based on my training and experience, I know that the Service Providers can collect E-911 Phase II data about the location of **Target Cell Phones**, including by initiating a signal to determine the location of **Target Cell Phones** on the Service Providers' network or with such other reference points as may be reasonably available.

**Pen-Trap Data**

101. Based on my training and experience, I know each cellular device has one or more unique identifiers embedded inside it. Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The unique identifiers – as transmitted from a cellular device to a cellular antenna or tower – can be recorded by pen-trap devices and indicate the identity of the cellular device making the communication without revealing the communication's content.

**Subscriber Information**

102. Based on my training and experience, I know that wireless providers such as the Service Providers typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the

subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as the Service Providers typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify **Target Cell Phones** user or users and may assist in the identification of co-conspirators.

103. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify **Target Cell Phones'** user or users, the locations of that user or users, and the patterns of that user or users. A frequency analysis of the telephone communications between J Jeanette LOPEZ, Samuel P. STAIR, Otis LOCKETT, J.M.L., Abraham M. LOPEZ, and other persons as yet unknown is material, in that it can establish whether the calls described above are a deviation from their normal patterns of communication. The frequency analysis of the locations associated with the cellular devices can establish whether the locations are deviations or consistent with normal patterns. This information is relevant to show whether J Jeanette LOPEZ, Samuel P. STAIR, Otis LOCKETT, J.M.L., Abraham M. LOPEZ, and other acted-in-concert, by establishing the nature and extent of their relationship, the existence and scope of the conspiracy, the pattern of their communications, their patterns of travel, and any deviations from those patterns.

## AUTHORIZATION REQUEST

104. Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

105. I further request that the Court direct the Service Providers to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.

106. I also request that the Court direct the Service Providers to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with the Service Providers' services, including by initiating a signal to determine the location of **Target Cell Phones** on the Service Providers' network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate the Service Providers for reasonable expenses incurred in furnishing such facilities or assistance.

107. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until April 29, 2026, pursuant to the Omnibus Order signed by Honorable Judge Stephen C. Dries on April 29, 2025. This investigation is expected to remain covert at least until then, so disclosing the warrant would alert targets or subjects about the existence of a federal investigation. This investigation targets a sophisticated drug trafficking organization with multiple targets, subjects, and witnesses. Case agents will continue to request the same notification deadline for all warrants in this investigation, so that the notifications can be coordinated or extended as necessary. A single notification date will reduce the administrative

burden on case agents and the Court, minimize the risks of disclosure, and promote judicial economy. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of **Target Cell Phones** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

108. Because the warrant will be served on the Service Providers, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate **Target Cell Phones** outside of daytime hours.

**ATTACHMENT A**
**Property to Be Searched**
**MATTER NUMBER 2024R438**

1. Records and information associated with the cellular device assigned call number:

   a. **(414) 439-8361** ("**TARGET TELEPHONE 1**"), used by Jeanette LOPEZ, and with listed subscriber LizMary Martinez and listed address of 196 Calle La Loma, Mayaguez, Puerto Rico;

   b. **414-639-1158** ("**TARGET TELEPHONE 2**"), used by Jeanette LOPEZ, and with listed subscriber Samual P. STAIR, and listed address of 11512 W Woodside Drive, Hales Corners, Wisconsin, 53130, whose service provider is T-Mobile ("Service Provider"); and

   c. **414-732-3682** ("**TARGET TELEPHONE 3**") used by Samuel P. STAIR, and with listed subscriber Samual P. STAIR,[7] and listed address of 11512 West Woodside Drive, Hales Corners, Wisconsin

(herein collectively refer as the **"Target Cell Phones"**), whose service provider is T-Mobile ("Service Provider") a wireless telephone service provider headquartered 4 Sylvan Way, Parsippany, New Jersey.

2. The **Target Cell Phones**.

[7] Case agents observed the different spelling of STAIR's first name with the service provider. Case agents have confirmed the spelling with the service provider, and it is Samual STAIR. Based on the investigation into the DTO, case agents believe this may just be a scrivener's error by the service provider.

**ATTACHMENT B**
**Particular Things to be Seized**
**MATTER NUMBER 2024R438**

## I. Information to be Disclosed by the Provider

To the extent that the information described in Attachment A is within the possession, custody, or control of the Service Providers, including any information that has been deleted but is still available to the Service Providers or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Service Providers is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

a. The following subscriber and historical information about the customers or subscribers associated with **Target Cell Phones** for the time period from April 10, 2026, to present:

   i. Names (including subscriber names, user names, and screen names);

   ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

   iii. Local and long distance telephone connection records;

   iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

   v. Length of service (including start date) and types of service utilized;

   vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

   vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address);

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records; and

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by **Target Cell Phones**, including:

(A) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

(B) information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received).

b. Information associated with each communication to and from **Target Cell Phones** for a period of 30 days from the date of this warrant, including:

i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii. Source and destination telephone numbers;

iii. Date, time, and duration of communication; and

iv. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the **Target Cell Phones** or will connect at the beginning and end of each communication.

The Court has also issued an order(s) pursuant to 18 U.S.C. § 3123, dated today's date, for such information associated with **Target Cell Phones**.

c. Information about the location of **Target Cell Phones** for a period of **30 days**, during all times of day and night. "Information about the location of **Target Cell Phones** includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Service Provider, the Service Provider is required to disclose the Location Information to the government. In addition, the Service Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the

Service Provider's services, including by initiating a signal to determine the location of **Target Cell Phones** on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

ii. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II. Information to be Seized by the Government

All information described above in Section I that constitutes evidence and instrumentalities of distribution and possession with intent to distribute controlled substances; conspiracy to distribute and possess with the intent to distribute controlled substances; maintain drug involved premises; use of a communication facility in furtherance of a drug trafficking offense, violations of Title 21, United States Code, Sections 841, 843(b), 846, and 856, have been committed by Jeanette LOPEZ, Samuel P. STAIR, Otis LOCKETT, J.M.L., Abraham M. LOPEZ, and other persons and other persons as yet unknown (hereinafter "TARGET SUBJECTS") since at least August 2024.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Service Provider in order to locate the things particularly described in this warrant.